UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY d/b/a ADM GRAIN COMPANY, ADM INTERNATIONAL SÀRL and AMERICAN RIVER TRANSPORTATION CO., LLC<br><br>VERSUS<br><br>M/T AMERICAN LIBERTY, her engines, tackle, apparel, etc., *in rem* | CIVIL ACTION NO.: 19-cv-10525<br>       c/w 19-cv-10925, 19-cv-11813, &<br>       19-cv-12748<br><br>SECTION R \| DIVISION 4<br><br>JUDGE VANCE<br><br>MAGISTRATE ROBY<br><br>**ALL CASES** |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ADM'S MOTION TO CHALLENGE SUFFICIENCY OF SECURITY (Rec. Doc. 98)**

Archer Daniels Midland Co., American River Transportation Co., LLC and ADM International, Sàrl (hereinafter collectively "ADM") provide this supplemental Memorandum to support of its Motion to Challenge Sufficiency of Security (Rec. Doc. 98) so the court will find:

1. The pre-accident value of the M/T AMERICAN LIBERTY on May 16, 2019 was $130 to $145 million, not $112.5 million;

2. The post-accident repair cost to restore the M/T AMERICAN LIBERTY to its pre-accident condition was no more than $2,683,521.32, not $3.5 million;

3. Steamship Mutual's reservations of rights to not pay funds based upon undisclosed terms in the "Rules of the Club" (Rec. Doc. 1-7, sections 2, 5) does not meet the requirements of Rule F; and

4. The fund should be increased to an unqualified commitment by a surety to pay at least $127,566,479, but not more than $142,566,479, plus interest on the fund amount at 6 percent per annum from June 6, 2019 until paid.

**FACTS/PROCEDURAL SETTING**

On May 16, 2019 the accident in question occurred causing damages to multiple potential tort claimants. On May 20, 2019 ADM caused a U.S. Marshal to arrest the M/T AMERICAN

LIBERTY under Rule C for its maritime tort lien. During the next several days, counsel for ADM and American Liberty Interests discussed security, early discovery, limitation and release of the vessel. It was apparent that the parties would not reach a full resolution of the issues as ADM claimed the vessel was worth substantially more than claimed by American Liberty Interests. Other interested parties who would be claimants were not involved in the discussion. So, the vessel was released with a commitment for an in rem appearance with the fund to be determined by the court later as the parties could not agree on value and American Liberty Interests flatly denied their vessel was worth anywhere near the amount alleged by ADM at that time.

On June 6, 2019, American Petroleum Tankers X, LLC and Crowley Global Ship Management, Inc. (collectively referred to as "American Liberty Interests") filed an *ex parte* Verified Complaint seeking Limitation of Liability under Rule F obtaining an Injunction staying the earlier filed Rule C Complaint of ADM and other suits by anyone arising out of the voyage.

ADM filed its Answer contesting the sufficiency of security and but sought an evidentiary hearing on the limitation fund. The court elected to consider the Motion based upon summary judgment-type evidence and allowed ADM to do discovery on the issue of Sufficiency of Security before briefing the issue.

## METHODOLOGY USED TO DATE TO CALCULATE FUND:

Rule F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions provides the methodology that should be used to determine the limitation fund. Specifically Rule F provides:

"Rule F – Limitation of Liability

(1) …any vessel owner may file a complaint in the appropriate district court, as provided in subdivision (9) of this rule, for limitation of liability pursuant to statute.

> The owner (a) shall deposit with the court, for the benefit of claimants, a sum equal to the amount or value of the owner's interest in the vessel and pending freight, or approved security therefor, and in addition such sums, or approved security therefor, as the court may from time to time fix as necessary to carry out the provisions of the statutes as amended;"

American Liberty Interests initially posted security in the amount of $109,250,000. This was based upon the Declaration of David J. Tantrum stating that the value of the M/T AMERICAN LIBERTY before the accident was not more than $112,500,000 (Rec. Doc. 1-3) which estimate was too low. A deduction was taken reducing the fund based upon June 3, 2019 repair estimate of $3,500,000 by Jason Fernandes (Rec. Doc. 1-4) which was too high. The cost of pending freight of $250,000 was added to the fund. This third factor is uncontested. Prejudgment interest at 6% per annum as provided in Rule F is likewise uncontested.

## PRE-ACCIDENT VALUE OF THE VESSEL

M/T AMERICAN LIBERTY's INTERTANKO CHARTERING QUESTIONNAIRE otherwise referred to as "Q-88 Chartering Form" updated May 20, 2019 was previously filed herein as Exhibit 1 (Rec. Doc. 98-2). It is a document regularly used by M/T AMERICAN LIBERTY and other ship interests, their agents, brokers and third parties to access detailed information about blue water ships. See Declaration of Pierot attached hereto as Exhibit 4. It was relied upon by F. R. Christiaan Pierot in formulating his opinions following production by counsel for American Liberty Interests.

Information relevant to the vessel value from the INTERTANKO form Q-88 is summarized as follows:

| Section | Information Documented | Facts re: AMERICAN LIBERTY |
|---|---|---|
| 1.4 | Date delivered/Builder | July 26, 2017/AKER Phila. Shipyard |
| 1.5 | Flag/Port of Registry | United States/Wilmington, DE |
| 1.8 | Type of Vessel | Oil Tanker |
| 1.9 | Type of Hull | Double Hull |
| 1.10 | Registered Owner | American Petroleum Tankers (US) |
| 1.11 | Technical Operator | Intrepid Ship Mgt (US) |
| 1.12 | Commercial Operator | Crowley Petroleum (US) |
| 1.13 | Disponent Owner | APT/Kinder Morgan (US) |
| 1.17 | Hull & Mach. Insured Value | $150,000,000 Feb. 20, 2020 |
| 1.18 | Classification Society | American Bureau of Shipping |
| 1.27 | Length Overall | 181.31 Meters |
| 1.29 | Extreme Breadth (beam) | 32.2 Meters |
| 1.30 | Molded Depth | 19.10 Meters |
| 1.35 | Net Tonnage | 13,454 |
| 1.36 | Gross Tonnage | 29,801 |
| 2 | Numerous Certificates | All in compliance |
| 3 | Nationality of Master/Crew | American/USA |
| 4 | For USA Calls | Spill response plans filed<br>Spill response organization (USA) |
| 12 | Operational History | CPP Marathon – Voyages to Tampa |

This information was supplemented with discovery responses which provide in pertinent part as follows:

The actual original build/construction cost of M/T AMERICAN LIBERTY was $154,068,000. See Exhibit 5, Answers of American Petroleum Tankers X, LLC and Crowley Global Ship Management, Inc. to Interrogatories, particularly Interrogatory No. 4.

While the hull and equipment of M/T AMERICAN LIBERTY was reportedly insured initially for $150,000,000 according to the Q-88 Chartering form (Exh. 1), the updated insured property value on the day of the accident was $145,900,000. See American Liberty Interests, Response 2, Responses to Request for Production of Documents, attached hereto as Exhibit 6. Thus in year two, the insured value was 96.2% of her original insured value, a reduction of 3.8% per year.

Chris Pierot, an expert marine broker engaged in ship vessel sales, estimated the vessel value at $130,000,000. See Declaration of Pierot, attached as Exhibit 4. His methodology was to take what he assumed was the acquisition cost, discount it by 4 percent per year and then adjust. However, he was low in the acquisition cost estimate because the ship was ordered at a cost of $142 million but the final total cost of the hull and machinery was $154 million.

It is known that the vessel was delivered from AKER Philadelphia ship yard on July 26, 2017. (See Q88, Exh. 1). It is known that the accident happened on May 16, 2019 (Rec. Doc. 1). The ship was 1 year, 9.5 months old on the accident date. The limitation action was filed June 6, 2019 after the ship was arrested. If the ship value decreased 4 percent per year or 8 percent in 2 years then 92% of the acquisition cost would be $142,742,560.

David Tantrum, estimator for American Liberty Interests, gave a declaration of $112,500,000 for the hull value as of the accident date. If true, that would mean the ship was

worth only 73% of its original acquisition costs one year and 9.5 months after delivery. That equates to a reduction of over 13.5% per year which is unreasonable. Tantrum's numbers are flawed because at that rate, the ship would only have a useful life of only 7.5 years. A more realistic estimate would be a 20 to 30-year useful life which would mean about a 3.33 % to 5% reduction per year on average. However, Pierot concludes about a 4% annual reduction is appropriate for the first few years, with increases later (see Pierot Declaration, Exh. 4).

Pierot notes there is a substantial difference in the fair market values (and construction costs) of chemical tankers that are authorized to engage in coastwise trade in the USA under the Jones Act. This is a reason valuation experts using sales based in Europe are low because those ships cannot trade between US ports.

Under the Jones Act, no foreign flag vessel can engage in U.S. Coastwise trade, which includes carrying oil from one U.S. port to another. 46 USC §55102. To engage in coastwise trade, Jones Act vessels must be owned by U.S. Citizens. 46 USC 12151; 46 USC §55102. The captain and crew must be U.S. Citizens. 46 USC §8103. With regard to companies, they are deemed to be non-citizens if more than 25% of their voting power is controlled by non-citizens. The penalty is forfeiture of all the cargo, 46 USC §55102, and a $10,000 fine. 46 USC §12151. U.S. Flag vessels have a monopoly on coastwise trade. *American Maritime Assn. v. Blumenthal,* 590 F. 2d 1156, 1166 (D.C. Cir., 1979); see also *Wirth Limited and Hoesch Siegerlandwerke A.G. Seigen v. SS ACADIA FOREST et al*, 537 F. 2d 1272, note 32 (5th Cir. 1976). More importantly, only U.S. citizens buy U.S. flag tankers because the Jones Act refuses a non-citizen any opportunity to buy, so transactions between U.S. residents typically are not handled in Europe. (See Pierot Declaration, Exh. 4). None of the sales of foreign flag oil tankers of similar size have comparable values.

Tantrum's background is European and he is a capable ship engineer. But his business does not concentrate on the buying and selling of U.S. flag tankers to the extent of Pierot. (See Pierot Declaration, Exh. 4). As to the pre-accident value of the M/T AMERICAN LIBERTY, Tantrum's opinion is flawed on an additional ground: Crowley Maritime, the Commercial operator per form Q88, is a large U.S. company experienced in the blue water deep draft shipping industry. Crowley is not new to the oil tanker business. Crowley and American Liberty Interests would not spend $154 million dollars for a ship that would be worth no more than $112,500,000 in one year and 9.5 months, a 27% reduction. Thus, Tantrum's vessel value is significantly understated.

**POST-ACCIDENT EXPENSE THAT DOES NOT INCREASE THE SHIP'S VALUE DOES NOT REDUCE THE LIMITATION FUND**

M/T AMERICAN LIBERTY sustained damage to her bow and port side in the accident. See Report of FMC produced by American Liberty Interests, Bates AL 229-AL 242 attached as Exhibit 7. American Liberty Interests took an inappropriate deduction from the limitation fund of $3,500,000 based upon the June 3, 2019 estimate of Jason Fernandes who estimated the cost of repairing the damage. (Rec. Doc 1-4). The question under Rule F is the value of the vessel, not the amount recoverable in a tort or hull insurance claim. So with the fair value pre-accident as a starting point, post-accident expenses that do not increase the ship's value do not properly reduce the limitation fund. The ship was loaded when the accident happened in the Mississippi River. The ship could have unloaded its cargo at New Orleans, but instead, she elected to perform temporary repairs in New Orleans, sail to Tampa, and discharge her cargo there.

The repair cost invoice has a gross cost of $2,862,629.16 but that is then reduced by credits for customer discounts of $198,091.17 so the total payable per invoice was $2,664,537.99. See Tampa Ship LLC invoices and breakdown produced by American Liberty Interests, Bates numbered AL 309 to AL 314, attached as Exhibit 8. The invoice of Tampa Ship after customer

credits was $2,664,537.99 but it included $1,057.67, which Fernandes, the hull and machinery surveyor, noted was for the account of the owners and should have been on a separate invoice for owners work during the same drydocking. See Exhibit 7, Bates AL 241-242; see Exhibit 8, Bates AL 313. American Liberty Interests improperly seek to reduce the fund by the $1,057.67 in unrelated owners work and $198,091.17 in customer discounts or credits that Tampa Ship never charged American Liberty Interests for the repairs! See Exhibit 8, Bates AL 309; and Exhibit 10, Bates AL 180. The fund is only reduced by the actual repair cost paid that restored the vessel to its pre-accident value: $2,664,537.99 per invoice, minus $1,057.67 which is $2,663,480.32.

M/T AMERICAN LIBERTY's basis for claiming a reduction in the fund of $3,178,536.94 is set forth in the following: Supplemental Answer to Interrogatories Regarding Motion to Challenge Security, Exhibit 9 at Answer 1; Supplemental Responses to Request for Production regarding Motion to Challenge Sufficiency of Security, Rec Doc. 152-1, answers 1, 4; and documents produced therewith, Exhibit 10, Bates numbered AL 170-183; and Exhibit 8, Bates AL309-314.

No basis is presented to justify the $3.5 million fund reduction except a pre-repair estimate which American Liberty Interests was aware was unsupported when repairs were completed at Tampa Shipyard, in June of 2019; yet no increase in security has been tendered through the present date.

The issue here is not what amounts are recoverable by M/T AMERICAN LIBERTY from its hull underwriters or what M/T AMERICAN LIBERTY's hull underwriters paid. The issue is what is the cost of the repairs that increased the value of the vessel from its post-accident damaged condition to repair the bow and side shell damage from the accident so that the limitation fund can accurately reflect the post-accident pre-repair hull value under Rule F. American Liberty Interests

itemized the costs it argues should reduce the limitation fund.  See American Liberty Interests Answer to Supplemental Interrogatory No. 1 (Exh. 9).  Specifically, M/T AMERICAN LIBERTY claims the following increased the value of the vessel to its pre-accident condition to justify a credit to the limitation fund in this answer (Exh. 9) whereas ADM's position is stated as to on each item in the order claimed by American Liberty Interests:

1. $157,932.75 - E.N. Bisso & Son, Inc. Invoice No. 142382 (Bates AL170-171) (Exh. 10) – Towage services to secure M/T AMERICAN LIBERTY to Holcim dock following the incident and assist in navigating to Buck Kreihs facility for temporary repairs.  ADM notes tug charges do not increase the value of the ship so this item should not reduce the limitation fund.

2. $9,755.70 - E.N. Bisso & Son, Inc. Invoice No. 142383 (Bates AL 172- Exh. 10) – Towage services to assist in navigating from Buck Kreihs facility to mouth of Mississippi River en route to Tampa, Florida for permanent repairs.  However, ADM notes tug charges do not increase the value of the ship so this item should not reduce the limitation fund.  These were charges that allowed completing of the voyage to Tampa.

3. $56,453.00 - Buck Kreihs Marine Repair, LLC (Bates AL 173-174; Exh. 10) – Temporary repairs to M/T AMERICAN LIBERTY post-incident.  However, ADM notes these charges should not reduce the fund because the temporary repairs were only necessary because the ship chose to sail to Tampa instead of conducting repairs in New Orleans.  A reason was Marathon wanted the cargo.  The ship would be worth the same amount after permanent repairs regardless of whether temporary repairs were

undertaken and no temporary repairs would be needed if the vessel was not made ready to sail to Tampa. Temporary repairs should not reduce the limitation fund.

4. $25,598.63 – Ardent Americas, LLC Invoice No. 29099713 (Bates AL 175 Exh. 10) – Naval architecture services regarding temporary repairs. However, ADM notes that temporary repairs do not increase the ship value over and above the value the ship would have after permanent repairs are completed. Again, this is an extra charge because the ship chose to complete its voyage to benefit Marathon, its charterer, instead of conducting repairs in New Orleans.

5. $10,617.00 - ABS Invoice No. 046132597105 (Bates AL 176-177 Exh. 10) – Damage survey by classification society post-incident. However, ADM notes this assessment did not increase the value of the ship and should not reduce the limitation fund.

6. $4,037.50 - Seabulk Towing Invoice No. TBT0010928 (Bates AL 178, Exh. 10) – Towage services to assist M/T AMERICAN LIBERTY in navigating from mouth of Tampa Bay to Marathon Terminal to offload cargo prior to undergoing permanent repairs. However, towing does not increase the value of the ship and should not reduce the limitation fund. It is a charge incurred for charterer's benefit to get the cargo to Tampa.

7. $10,087.50 - Seabulk Towing Invoice No. TBT0010945 (Bates AL 179, Exh. 10) – Towage services to assist M/T AMERICAN LIBERTY in navigating from Marathon Terminal after offloading cargo to Tampa Ship facility for permanent repairs. However, towing does not increase the value of the ship so this should not reduce the limitation fund.

8. $2,862,629.16 - Tampa Ship, LLC dated 15 July 2019 (Bates AL309-312, Exh. 8) – Gross Price of permanent repairs to M/T AMERICAN LIBERTY with no reduction to actual amounts paid due to customer credits and including $1,057.67 for overtime services. This does include $2,663,480.32 in actual repairs that increased the value of the vessel to repair work from the casualty. This is the amount that was approved by Fernandes for submission to hull underwriters after the fluff was trimmed. See Exhibit 7, Bates American Liberty 242. American Liberty Interests claims it should have the benefit of a reduction of $198,091.17 (Exh. 8, Bates AL 309). Customer credits from Tampa Ship, LLC should be disallowed for the reasons stated above.

9. $21,384.70 - Fernandes Maritime Consultants, LLC Invoice No. 09-193946-JFF (Exh. 10, Bates AL 181-182) – Maritime surveying services to identify damage associated with incident, propose repairs, and inspect completed repair work. However, the Fernandes survey for hull underwriters did not increase the value of the vessel so his charges should not reduce the limitation fund. They are also duplicative of the ABS Class surveyor, below. Finally, the production by American Liberty Interests deleted FMC's description of its own services likely because he was working for hull underwriters. See Exhibit 10, Bates AL 181-182.

10. $20,041.00 - ABS Invoice No. 017134600405 (Exh. 10, Bates AL 183) - Repair survey by classification society for permanent repairs. The class certification of the permanent repairs did restore value because the ship needed to maintain its class certification to be as valuable as it was before the accident according to the Declaration of Pierot, Exhibit 4. This is the only item outside the Tampa repair bill that should give rise to a reduction in the limitation fund.

In summary, the total amount of a reduction for repairs that increased the value of the ship to restore its pre-accident state was: $2,663,480.32 paid to Tampa Ship plus $20,041.00 paid to ABS for a total of $ 2,683,521.32. Assuming the vessel value before the accident is found by the court to be at least $130,000,000.00, then the fair market value net of repairs before freight (Rec. Doc. 1-5) and pre-judgment interest of 6 percent per annum under Rule F (1) would be the difference, at least $127,316,478.68.

With regard to authentication of the documents referenced hereto produced by American Liberty Interests, see Certificate of Counsel Under Penalty of Perjury issued in accordance with 28 U.S.C §1746 attached as Exhibit 11.

## STEAMSHIP MUTUAL'S IMPROPER RESERVATIONS OF RIGHTS:

The form of the Letter of Undertaking, Rec. Doc 1-7, is insufficient because the amount is too low. But it is also insufficient because Steamship Mutual P & I club says in paragraph 2 that instead of unconditionally agreeing to pay the money to the clerk, the club's liability shall be strictly subject to the terms and conditions of the Rules of the Club. This departs from the unconditional obligation to pay of a surety contemplated by Rule F. Similarly, paragraph 5 says "the Club Reserves all rights under its Rules." The reservations should be stricken or a surety bond should be substituted. Failing that, the Limitation should be dismissed.

## CONCLUSION

The pre-accident value of M/T AMERICAN LIBERTY, acquired for $154,068,000 and less than 2 years old, should be between $130 million and $145 million subject to a reduction only for actual post-accident repair costs and class certification of permanent repairs that restored the vessel's value; thus, the fund reduction should be limited to $2,683,521.32, not $3.5 million. Freight of $250,000 should be added per affidavit at Rec.Doc. 1-5. The new fund amount

including freight should be between $127,566,478.68 and $142,566,478.68. The fund should bear interest at 6 percent per annum from June 6, 2019 until paid, secured in the form a surety bond or unconditional promise of Steamship Mutual to pay without reservation except as to the fund as determined by the court. Adequate security with a realistic vessel value may also increase the chances of a global amicable resolution prior to trial.

                                              Respectfully submitted:

                                              SALLEY, HITE, MERCER & RESOR, LLC

                                              */s/ David M. Flotte*
                                              DAVID M. FLOTTE, T.A. (#1364)
                                              MARCELLE P. MOULEDOUX (#30339)
                                              KEVIN M. FREY (#35133)
                                              AUSTIN S. GLASCOE (#38236)
                                              365 Canal Street, Suite 1710
                                              New Orleans, LA  70130
                                              Tel.: (504) 566-8800
                                              Fax: (504) 566-8828
                                              dflotte@shrmlaw.com
                                              mmouledoux@shrmlaw.com
                                              kfrey@shmrlaw.com
                                              aglascoe@shmrlaw.com

                                              *Counsel for Archer Daniels Midland*
                                              *Company d/b/a ADM Grain Company,*
                                              *ADM International Sàrl, and*
                                              *American River Transportation Co., LLC*

## CERTIFICATE OF SERVICE

     I hereby certify that on May 22, 2020, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all persons electronically noticed.

                                    */s/ David M. Flotte*
                                  DAVID M. FLOTTE