**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ARCHER DANIELS MIDLAND, CO., ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-10525 C/W 19-10925, 19-11813, 19-12748** |
| **M/T AMERICAN LIBERTY** | **SECTION "L" (1)** |

**ORDER AND REASONS**

Before the Court is a motion for summary judgment by E.N. Bisson & Son, Inc. and Bisso Offshore, LLC (collectively, "E.N. Bisso"), seeking exoneration from all claims against it arising out of a series of allisions involving the M/T AMERICAN LIBERTY. R. Doc. 355. Claimants Clement Bell, Ryheme Knighton, Robert Sayles (collectively, "Claimants") oppose the motion. R. Doc. 366. Having considered the parties' arguments and the applicable law, the Court now rules as follows.

## I.    BACKGROUND

This case arises from a maritime casualty that occurred on the Lower Mississippi River on May 16, 2019.[1] Shortly after leaving its berth, the M/T AMERICAN LIBERTY, an oil and chemical tanker, allegedly lost control and allided with the crane barge DON D, the M/V AFRICAN GRIFFON, the M/V EVER GRACE, the Archer Daniels Midland ("ADM") Reserve, Louisiana grain facility, a barge fleet operated by American River Transportation Co., LLC ("ARTCO"), and the ADM Dock owned by the Port of South Louisiana ("PSL").

---

[1] The Court assumes familiarity with the factual and procedural background of this case. *See generally*, R. Doc. 162.

1

Relevant to the instant motion, two of E.N. Bisso's tugboats, the M/V JOSEPHINE ANNE ("JOSEPHINE ANNE") under the conn of Capt. Donald Laughlin and the M/V VERA BISSO ("VERA") under the conn of Capt. Cary Prejean, and a federally licensed pilot, Brandon Woodford ("Pilot Woodford") were ordered by local agents[2] of the AMERICAN LIBERTY to assist the Vessel in a turning maneuver as she departed from the Marathon Petroleum Garyville Dock. During the initial phase of maneuvers, Pilot Woodford took the AMERICAN LIBERTY off the dock and began turning her counter-clockwise in the river with the JOSEPHINE ANNE pulling on her port bow and the VERA pushing on her port quarter.[3] During the undocking, the tugs essentially functioned as auxiliary engines available for Pilot Woodford's use. *Id.* at 5.[4]

Between 20:34 and 20:35, Pilot Woodford ordered the VERA to go "All Stop", and released her from the job, saying: "You can go ahead and go."[5]. Upon receiving this confirmation, Capt. Prejean turned the VERA southbound and proceeded downriver to go secure the tug.[6] Although the parties dispute whether the VERA was released by the pilot too early,[7] it is not disputed that the situation was under control at this time.

Then, from 20:35-20:38, the JOSEPHINE ANNE performed some additional orders from Pilot Woodford, pushing the Vessel as it awaited the full RPMs to be delivered by the engines.[8] Over the next several minutes, there appears to have been disagreement and confusion on the bridge of the AMERICAN LIBERTY, and the situation quickly devolved. Pilot

---

[2] There appears to be a dispute of fact as to whether the decision was made by the Vessel's Master or the agent for the charterer, Marathon Petroleum. *Compare* R. Doc. 355-11, Laughlin Dep., 74:25-75:12; R. Doc. 355-12, Kuiken Dep., 107:9-15 *with* R. Doc. 366-1, Bonvino Dep., 306:19-25.

[3] R. Doc. 355-1 at 7.

[4] Woodford Dep. 345:2-10.

[5] This is confirmed by the AMERICAN LIBERTY's VDR recording and the testimony of Pilot Woodford, Capt. Bonvino, and Capt. Prejean of the VERA. R. Doc. 355-1 at 8; *see also* Woodford Dep. 225:9-226:18; 270:21-271:8. Laughlin Dep. 89:16-23. Prejean Dep. 73:10-75:12

[6] R. Doc. 355-11; Prejean Dep. 26:16-24.

[7] *See* Cpt. Thomas Dep. 220:10-16. ("Q: Do you believe that the premature releasing of the tugs was a contributing factor, right? That is what we talked about when we were talking about Mr. Kuiken's testimony, is that correct? A: Yeah. They were a contributing factor, yes."). Kuigen Dep. 214-15; Exhibit F, Cpt. Rivera Dep., 176: 10-25.

[8] Laughlin pp. 39:7-21; 93:1-16.

Woodford called for the VERA to return to assist, but as the VERA approached the AMERICAN LIBERTY, Capt. Prejean informed Pilot Woodford that he could not reach the portside bow of the Vessel because the JOSEPHINE ANNE was still tethered there waiting on the Vessel's crew to release her line.[9]

At a certain point it became clear that the JOSEPHINE ANNE was in a dangerous position between the tanker and the docks. Pilot Woodford ordered the JOSEPHINE ANNE to get out of harm's way.[10] Moments before the first allision, the crew on the AMERICAN LIBERTY released the JOSEPHINE ANNE's line and the JOSEPHINE moved to a place of safety.[11] No additional commands were given from the time the line was released until after the allisions between the AMERICAN LIBERTY and the docks and vessels involved in the incident. R. Doc. 355-2 ¶ 30. Eventually, the AMERICAN LIBERTY came to a stop and was secured at the Globalplex dock, and the JOSEPHINE ANNE and VERA remained on-site to keep the vessel held into the dock. R. Doc. 355-1 at 12.

On July 24, 2019, E.N. Bisso, as owner of the JOSEPHINE ANNE, filed a Complaint for Exoneration From, or Alternatively, Limitation of Liability and Declaratory Judgment, which was consolidated with other related limitation actions and the suit by ADM against the AMERICAN LIBERTY, *in rem.* Thereafter, claims were brought against E.N. Bisso by Clement Bell, Ryheme Knighton, and Robert Salyes; ADM; Certain ADM insurers; PSL; Associated Marine, Equipment LLC and Associated Terminals, LLC; and American Petroleum Tankers X LLC and Crowley Global Ship Management.

## II.   PRESENT MOTIONS

### a.   E.N. Bisso's Motion for Summary Judgment [R. Doc. 355]

---

[9] Prejean Dep. 29:14-30:5; 31:3-14; 32:10-25; 70:2-9; Woodford Dep.

[10]

[11] Bonvino Dep. 392:14-394:15.

E.N. Bisso now moves for the dismissal of all claims against it for the maritime casualty that occurred on May 16, 2019. R. Doc. 355. E.N. Bisso argues that it is entitled to exoneration because its tugs, the JOSEPHINE ANNE and the VERA BISSO, fulfilled all legal duties by working as directed and properly performing all orders given by federal Pilot Woodford on the night of the incident. *Id.* at 15. Bisso argues that granting this motion would not require the Court to determine the cause of the AMERICAN LIBERTY's loss of control or to resolve any factual disputes regarding the performance of her engine or her crew. Rather, Bisso points out that among the multiple expert reports produced in this case, none have attributed fault for the incident to any negligence of either of the Bisso tugs or their crews.

### b.  Claimants' Opposition [R. Doc. 366]

The personal injury claimants oppose the motion. R. Doc. 366. Claimants argue that in addition to the duty to follow all orders from the tow's commander, assist tugs must also exercise a duty of care reasonable care under the circumstances. Claimants insist that genuine issues of fact exist as to whether, and to what extent, the use of Bisso's tugs contributed to this accident. Specifically, claimants argue that first, there is a dispute as to whether the VERA properly followed all commands and second, there is dispute as to whether the JOSEPHINE ANNE and VERA BISSO failed to exercise reasonable care after realizing the AMERICAN LIBERTY was deviating from its course by not communicating its concerns to the AMERICAN LIBERTY or other vessels in the vicinity or taking some other action to assist the vessel. *Id*. at 12-14.

### c.  E.N. Bisso's Reply [R. Doc. 403]

In reply, Bisso maintains that the duty owned by assist tugs is simply to "carry out the orders of the pilot or commander of the dominant vessel." R. Doc. 403 at 6. Bisso argues that contrary to Claimants' assertions, no case has found that assist tugs have "a duty to warn a pilot of his ship's position in a river under any circumstances." *Id*. Instead, Bisso insists the case law

is clear that "[a]ssist tugs are subservient to a manned and piloted vessel, and 'have a duty to follow the orders of others rather than taking action on their own.'" *Id.* at 7 (citing *In the Matter of Can Do Inc. I*, 2004 WL 2216529 (E.D. La. September 30, 2004) (internal citation omitted)). Bisso distinguishes the authorities cited by claimants as inapposite, as they involve duties owed by tugs to dumb barges in its tow, rather than duties owed by assist or helper tugs. *Id.* Lastly, Bisso argues that even if a duty to warn existed, there is no competent evidence that a warning would have prevented the casualty in this case. *Id.* at 6.

## III.   LAW & ANALYSIS

### a. Standard

Summary judgment is appropriate if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When the moving party has met its Rule 56(c) burden, the non-movant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster,* 227 F.3d 504, 508 (5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253 (1986). Furthermore, "[t]he non-movant cannot avoid summary judgment ... by merely making 'conclusory allegations' or 'unsubstantiated assertions.' " *Calbillo v. Cavender Oldsmobile, Inc.,* 288 F.3d 721, 725 (5th Cir. 2002) (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994)). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the

light most favorable to the nonmovant. *Id.* at 255.

When the non-moving party bears the burden of proof on a claim, the moving party may obtain summary judgment without providing evidence that negates the non-moving party's claim. *See Celotex Corp.*, 477 U.S. at 322–25, (1986). Rather, the moving party need only highlight the absence of evidence in support of the non-moving party's claim. *See id.*

### b. Discussion

Under the Limitation of Liability Act, a vessel owner is entitled to exoneration if he, his vessel, and crew are "shown to be free from fault." *Tittle v. Aldacosta*, 544 F.2d 752, 755 (5th Cir.1977)). "The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and uses." *ADM Int'l SARL v. River Ventures, LLC*, 441 F. Supp. 3d 364, 374–75 (E.D. La. 2020) (quoting *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006)). Absent a statutory violation, liability may be also imposed where there is negligence. The standard for negligence under general maritime law mirrors that of "land-based negligence under the common law." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010). Accordingly, a claimant must demonstrate 1) a duty owed; 2) a breach of the duty; 3) injury; and 4) a causal connection between the conduct and the injury. *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir.1991)).

Generally, assist tugs have a duty to "promptly execute the orders of the tow's commander." *Bisso v. Waterways Transp. Co.*, 235 F.2d 741, 746 (5th Cir. 1956). "Assist tugs have a duty to follow the orders of others rather than taking action on their own." *In re Can Do, Inc. I*, No. 02-067, 2004 WL 2216529, at *9 (E.D. La. Sept. 30, 2004) (citing *Crowley Am. Transp., Inc. v. Double Eagle Marine, Inc.,* 208 F.Supp.2d 1250, 1267 (S.D.Ala.2002)). In fact, the Fifth Circuit has previously recognized that "chaos would indeed prevail if a helper tug either

did, or felt under compulsion to determine, what that tug from its limited point of view thought ought to be done." *Bisso*, 235 F.2d at 746. Assist tugs also have a duty to act with reasonable care and to execute maneuvers "as prudence requires under the circumstances as they develop." *Houston Towing Co. v. United States*, 23 F.2d 528, 530 (S.D. Tex. 1928). Put differently, a tug "owes a duty to exercise reasonable care and maritime skill, as prudent navigators employ in the performance of similar services."*Aiple Towing Co. v. M/V Lynne E. Quinn*, 534 F. Supp. 409, 411 (E.D. La. 1982).

An assist tug may be exonerated from liability provided the tug obeyed all orders and was not guilty of negligence, either in the manner of executing the orders or by participating in an obviously dangerous maneuver. *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 527 F. Supp. 824, 834 (E.D. La. 1981), *aff'd*, 699 F.2d 240 (5th Cir. 1983) (citing *Dow Chemical Co. v. Tug THOMAS ALLEN*, 349 F.Supp. 1354 (E.D.La.1972)). Here, the threshold issue is whether the tugs obeyed the orders of Pilot Woodford. Bisso argues that the tugs should be exonerated because they followed all *executable* commands. In support of this contention, Bisso offers Pilot Woodford's testimony that the tugs satisfactorily performed all orders during the incident.[12] Bisso contends that Pilot Woodford is uniquely positioned to judge the tugs' responsiveness to orders because he is the only person who communicated with the tugs on the night of the incident and was aware of the all of the orders given. R. Doc. 355-1 at 20-21.

Claimants respond, however, by pointing to two specific orders the VERA failed to carry out: (1) the order to return to the Vessel to push on the bow on the port side and (2) the order to get on the bow once the Vessel arrived at the Globalplex dock. R. Doc. 366 at 6. Bisso replies that the VERA was unable to carry out these orders safely. First, the VERA could not return to push on the bow because the JOSEPHINE ANNE was in the way and there was not enough room

---

[12] R. Doc. 355-9, Woodford Dep. 346:23-347:11.

between the JOSEPHINE ANNE and the east bank.[13]. Second, the VERA could not get on the starboard bow at the Globalplex dock because of the position of the anchor.[14] Claimants have not offered any testimony or evidence suggesting that the VERA could have executed either of the orders Claimants refer to; therefore, the Court finds that there is no dispute of fact as whether Bisso complied with all executable orders.

The next issue is whether the stern tug, the VERA, was released earlier than normal because it was "rushing to clock out for the day." R. Doc. 366 at 4, 11. Claimants offers the deposition of third mate on the AMERICAN LIBERTY McDaniel, who stated the pilot released the stern tug early because the tug informed the pilot that it "needed to go" as it was its "last shift." R. Doc. 366 at 11.[15] Claimants argue that this caused the pilot to release the stern tug earlier than normal, contributing to the accident. This is not supported by the evidence, including the audio from the AMERICAN LIBERTY's VDR, which shows that this statement was actually made by Laughlin on the JOSEPHINE ANNE about covering "two hitches" for another crew member. In addition, Pilot Woodford testified that he did not recall any such exchange and released the VERA at the same point he always releases tugs, not because of anything she said.[16] While the timing of the VERA's release is certainly a central issue for this case, [17] there is no evidence that the VERA influenced this decision.

The last issue is whether the assist tugs, due to their vantage points and experience in the Mississippi River, could see that the AMERICAN LIBERTY was going off course and should

---

[13] R. Doc. 355-14, Prejean Dep. 29:6-23.
[14] Prejean Dep. 43:10-21
[15] R. Doc. 366-4, McDaniel Dep. 118:20-24.
[16] R. Doc. 403-3, Woodford Dep. 154:4-20.
[17] *See e.g.,* R. Doc. 366-1, Cpt. Craig Thomas Dep. 220:10-16. ("Q: Do you believe that the premature releasing of the tugs was a contributing factor, right? That is what we talked about when we were talking about Mr. Kuiken's testimony, is that correct? A: Yeah. They were a contributing factor, yes."); R. Doc. 366-6, Conrad Kuiken Dep. 214:21-215:2 ("Q: If the vessel had been able to get power more quickly early on, do you think it would have been possible to avoid this incident? A: It's not—It's hard to say, to be candid. In my mind the critical factor was the use of the tugs.")

have taken some precautionary or corrective action. For example, Capt. Prejean testified that it seemed the Vessel was "getting in trouble," so he turned around to go back to the Vessel but by the time the VERA got there, "it was pretty much too late" and the VERA was unable to get on the Vessel's bow.[18] Capt. Laughlin of the JOSEPHINE ANNE also stated that he became "concerned" when the VERA was called to return as he realized that "something was definitely wrong somewhere because the ship was starting to fall down towards the east bank into the docks."[19]

"Summary judgment is rarely granted in maritime negligence cases because the issue of whether a defendant acted reasonably is ordinarily a question for the trier of fact." *Luwisch v. Am. Marine Corp.,* No. CV 17-3241, 2018 WL 3031887, at *4 (E.D. La. June 18, 2018) (internal citation omitted). Claimants suggest the tugs should have taken some sort of corrective action, such as (1) radio the AMERICAN LIBERTY to relay their concerns, (2) (suggest to) summon more tugs to help avoid the disaster, (3) communicate among each other, (4) offer their experience and insight as to what might have helped in getting the AMERICAN LIBERTY back on course, (5) contact the U.S. Coast Guard, and so on. Claimants further offer expert testimony that the tugs' combined 8,0000 horsepower,[20] if used correctly, should have been sufficient for the turning maneuver.[21] Here, there is no genuine issue of fact that the tugs complied with the orders given by Pilot Woodford. Bisso has also shown that Capt. Laughlin of the JOSEPHINE ANNE sent out a radio warning to others in the vicinity of the ensuing danger of the AMERICAN LIBERTY. R. Doc. 403 at 13-14. There is a dispute, however, as to whether these actions are sufficient to satisfy the duty of care, precluding summary judgment at this juncture.

Claimants face a significant hurdle in proving independent negligence on the part of the

---

[18] R. Doc. 366-4, Prejean Dep. 6:13-7:8.
[19] R. Doc. 366-8, Laughlin Dep. 13:5-14:8.
[20] R.Doc. 366-5, Fazioli Dep. 368:14-16.
[21] R. Doc. 366-5, Fazioli Dep. 126:11-17.

assist tugs,[22] but whether the tugs satisfied their duty of reasonable care under the circumstances of this multi-vessel incident is a factual issue to be resolved by the factfinder at trial.

**IV.    CONCLUSION**

For the foregoing reasons,

**IT IS ORDERED** that the motion for summary judgment, R. Doc. 355, is hereby **DENIED.**

New Orleans, Louisiana, this 11th day of May, 2021.

UNITED STATES DISTRICT JUDGE

---

[22] Though not required to prove negligence, Claimants concede that none of their experts opined on the fault of the tugs during the incident.