UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ARCHER DANIELS MIDLAND COMPANY d/b/a ADM GRAIN COMPANY, ADM INTERNATIONAL SÀRL and AMERICAN RIVER TRANSPORTATION CO., LLC<br><br>VERSUS<br><br>M/T AMERICAN LIBERTY, her engines, tackle, apparel, etc., *in rem* | CIVIL ACTION NO.: 19-cv-10525<br>      c/w 19-cv-10925 & 19-cv-11813<br><br>SECTION L \| DIVISION 1<br><br>JUDGE FALLON<br><br>MAGISTRATE VAN MEERVELD<br><br>RE: 19-cv-10925 |

## ADM ENTITIES' POST-TRIAL BRIEF ON CROWLEY/APTX'S LIMITATION OF LIABILITY ACTION

MAY IT PLEASE THE COURT:

Claimants Archer Daniels Midland Company d/b/a ADM Grain Company, ADM International Sàrl, and American River Transportation Co., LLC (hereinafter collectively "ADM Entities") submit this *Post-Trial Brief* on the failure of Crowley Global Ship Management, Inc. ("Crowley") and American Petroleum Tankers X, LLC ("APTX") (collectively referred to as "Vessel Interests") to carry their burden of proof for their limitation of liability action under 46 U.S.C. §§ 30501, *et seq*.

    **I.**    **ADM Entities exceeded their burden of proof by demonstrating not one, but both of the following: (1) Vessel Interests' negligence caused the allisions, and (2) the M/T AMERICAN LIBERTY was unseaworthy, which also caused the allision.**

When a vessel owner pleads limitation of liability, claimants seeking to recover must first prove the damages sustained were a result of the vessel owner's negligence *or* the unseaworthiness

Page **1** of **12**

of the vessel.[1] An incompetent crew renders a vessel unseaworthy.[2] Claimants need not prove both unseaworthiness and negligence – only one. If the claimants make such a showing, the burden then shifts to the vessel owner to prove the negligence or unseaworthiness occurred without the owner's privity or knowledge.[3] Privity or knowledge includes what the vessel owner knew or should have known.[4] A vessel owner who cannot satisfy this burden cannot limit liability.[5]

### A. The Vessel Interests' negligence caused the allisions and resulting property damage.

#### i. During trial, Crowley admitted to various errors that contributed to the allisions.

This accident resulted from a string of negligent errors that occurred both pre- and post-departure, at both the corporate and individual levels. During trial, ADM Entities successfully proved the M/T AMERICAN LIBERTY ("Vessel"), and its owners negligently caused the allisions. In fact, Vessel Interests made these admissions themselves. Crowley's navigation expert, Captain Sanjeev Gupta, testified during cross examination that the Vessel's crew generally contributed to the string of errors causing the allisions.

Captain Bonvino made a more specific admission during trial: He should have asked for clarification when Pilot Woodford ordered "give me slow ahead when you can" at VDR time 01:35:10. Instead of seeking clarification, Captain Bonvino delayed 32 seconds before physically inputting the "slow ahead" engine order. Captain Bonvino's delay allowed the flood-stage current to irretrievably overcome the Vessel. In an approximation of Captain Bonvino's testimony, "this

---

[1] *In re Int'l Marine, LLC*, 614 F. Supp. 2d 733, 740 (E.D. La. 2009) (Fallon, J.); *see also ADM Int'l Sarl v. River Ventures, LLC, et al.*, No. 18-3466, 441 F. Supp. 3d 364 (E.D. La. Feb. 28, 2020).
[2] *Lemar Towing Co., Inc. v. Fireman's Fund Ins. Co.*, 352 F. Supp. 652, 661 (E.D. La. 1972).
[3] *See supra* fn. 1.
[4] *Id.*
[5] *Id.*

was the first part of the error chain that caused the collision." (ADM Entities disagree to an extent – the first error occurred before the Vessel left the dock.)

Captain Bonvino testified to making another error: He should have discussed the tug release with Pilot Woodford during the master-pilot exchange. The tug release was a critical step in the maneuver off Marathon's dock because the Vessel would then rely on its own means of propulsion. Release of the tug presumes the Vessel was in a position capable of maneuvering independently. Captain Bonvino testified that his failure to discuss the tug release with Pilot Brandon Woodford during the master-pilot exchange was a violation of the Vessel Operations Manual ("VOM").

Not only did Captain Bonvino fail to discuss the tug release with the Pilot, but he also failed to mind when Pilot Woodford actually released the stern tug during the maneuver. Crowley categorized the Pilot's tug release as "premature," an argument relied on heavily by Crowley against the Pilot at trial. Captain Bonvino appeared to distance himself from the alleged "premature" release of the stern tug by claiming he did not hear the Pilot release it. Captain Bonvino had a duty to be situationally aware during the maneuver, however. Ultimately, he missed both opportunities – pre-departure and post-departure – to provide any perceived corrective action regarding the tug release.[6]

> ii. **Crowley failed to train the Vessel crew how to properly operate Kongsberg system.**

While many errors occurred after the Vessel left the dock, perhaps the most significant errors occurred landside. Captain Bonvino admitted that Crowley never trained him on the Kongsberg automation system or when to press the cancel limits button. Conrad Kuiken, the

---

[6] ADM Entities contend that Pilot Woodford's release of the stern tug a decision predicated on a vessel unconstrained by any acceleration limiters. According to Pilot Woodford's uncontested testimony, the accident would likely would not have occurred had he attained the RPMs he ordered at VDR time 01:35:10.

Crowley corporate representative, confirmed that no Kongsberg training occurred. In fact, Conrad Kuiken did not know specifically what engine limiters were on the Vessel or how they affected its maneuverability. The APTX representative, Scott Clapham, also did not know these details. The Chief Engineer, Frederick Loewen, lacked the same knowledge. None of the crew knew, either. Any of the crew's understanding of the Kongsberg system was gleaned through on-the-job trial and error. The events that occurred on May 16, 2019 reveal the risks involved in learning from trial and error.

In terms of on-the-job training, Captain Bonvino testified that he typically pushed the "cancel limits" button before undocking. This procedure was an anecdotal understanding of the Kongsberg system, rather than a procedure rooted in company policy. As revealed during trial, there was no company policy involving the Kongsberg system, engine limitations, or cancellation thereof. Captain Bonvino's habit of pushing the cancel limits button before leaving the dock should not be construed as such.

### iii. Crowley failed to provide simulator training on loss of propulsion situations at night in high river.

Crowley failed to provide simulator training for loss of propulsion in high river stages of the Mississippi River. This type of training is readily available and used widely in this industry. High river stages increase the velocity of the current, which, in turn, negatively impact the maneuverability of a vessel. High river stages are a periodic reality of the Mississippi River known to any local mariner, as explained by Captain Keijer, Captain Rivera, and Captain Fazioli. Bonvino and the crew came face-to-face with this reality, as they were left to blunder through a loss of propulsion at night, during flood stage, without the benefit of simulator training. This was an unreasonable failure on Crowley's part.

### iv. The crew failed to adhere to the passage plan.

Captain Bonvino and the crew deviated from the passage plan, which would have put more distance between the Vessel's 180-degree turn and the hazards it ultimately struck. The passage plan directed the Vessel to turn around at "Waypoint One," a position in the river slightly upbound from the Marathon dock number two. The passage plan was not discussed with the Pilot, nor followed by the crew and, if followed, would have given the ship more time to react to its abnormal rate of propulsion.

### v. Crowley failed to train its crew on "taking the con."

Crowley failed to provide training on how to "take the con" from a pilot in emergency situations. As Captain Rivera testified, taking the con is a practice used worldwide in the commercial maritime industry, with a specific meaning, implication, and jargon. A captain must take the con from a pilot when his vessel is in danger. That is not what happened here. Captain Bonvino never took the con, as the current quickly set the Vessel towards its collision course on the East Bank. Instead, Captain Bonvino silently countermanded or delayed in executing Pilot Woodford's commands. This was unknown to Pilot Woodford or the crew. Captain Bonvino's silent dissidence translated into a loss of situational awareness for the crew, who were responding to the verbal orders of the Pilot while the Captain was quietly charting his own course. This course, which involved denying Pilot Woodford the RPMs needed to outmaneuver the current, defied logic and prudent seamanship.

After this critical moment, Captain Bonvino continued to work against the Pilot, but failed to properly "take the con." Around VDR time 01:40:20, Captain Bonvino gave a command – "don't listen to the pilot." Lest this be construed as a fulfillment of his duties, Captain Bonvino still had not taken the con. These words are insufficient to convey taking the con, and Captain

Bonvino testified that it was not his intention to do so. Due to Captain Bonvino's actions/inaction, the chain of command was unclear and produced a disorganized, chaotic response to the emergent crisis.

### B. The Vessel crew's incompetency rendered the Vessel unseaworthy and caused the allisions.

The Vessel's incompetent captain and crew rendered it unseaworthy. Many of the aforementioned instances of Crowley negligence also translate to crew incompetency. Crowley did not train its captain and crew how to operate the Kongsberg system and the unknown limiters affecting the Vessel. This knowledge deficit directly contributed to the allisions. Had the crew obtained a formal education on the Vessel's limitations, the sluggish engine response at a critical moment in the maneuver would not have caught them by surprise. Crowley also failed to ensure the crew knew to communicate these limiting restrictions to Pilot Woodford. Because they had no training, the crew/Captain Bonvino accordingly did not alert Pilot Woodford that the Vessel was impaired. This created crew incompetency. Crowley's failure to train on taking the con or provide relevant simulator training similarly created a knowledge deficit in the crew. Ultimately, the crew was significantly undertrained in many skillsets that would have been useful, if not event-altering, on the night of the allisions. This created an unseaworthy condition on the Vessel that proximately caused the damage Claimants allege.

## II. Vessel Interests had knowledge of the negligence and unseaworthiness that caused the allisions.

Once liability is established, the burden of proof shifts to vessel owners to prove the loss was occasioned without privity or knowledge of the negligence underlying liability.[7] "Privity" means some fault on the part of the vessel owners in which they personally participated.[8]

---

[7] *Id.*
[8] *Matter of Texaco, Inc.*, 570 F. Supp. 1272, 1278 (E.D. La. 1983).

"Knowledge," as used in the regulation, means "personal cognizance or *means of knowledge of which the shipowner is bound to avail himself*."[9] The ship owner must prove lack of privity or knowledge.[10] Crowley has not done so here. Failure to train the master or crew can demonstrate that a vessel owner has privity or knowledge, which defeats limitation.[11] Failure to adhere to a federal regulation, when such failure contributes to the accident, imputes privity or knowledge to the vessel owner and defeats limitation.[12] When multiple acts or omissions lead to a casualty, privity or knowledge of *any* one causative factor precludes vessel owners from limiting liability under 46 U.S.C. §§ 30501, *et seq*.[13]

### A. Vessel Interests violated 33 U.S.C. § 165.810 and 33 U.S.C. § 164.11, and such violations directly contributed to the accident.

Crowley violated federal regulation 33 U.S.C. § 165.810, "Mississippi River, LA-regulated navigation area," which states in part,

> (a) This section prescribes rules for all vessels operating in the Lower Mississippi River below mile 233.9 above Head of Passes including South Pass and Southwest Pass, to assist in the prevention of allisions; collisions and groundings so as to ensure port safety and protect the navigable waters of the Mississippi River from environmental harm resulting from those incidents, and to enhance

---

[9] *Id.* (Emphasis added).
[10] *Id.*
[11] *See In re BOPCO, L.P.*, No. 11-3137, 2013 WL 4854121, at *5, *7 (E.D. La. Sept. 10, 2013) (holding that a vessel owner was not entitled to limit liability after it instructed a captain not to use radar and the act of not using radar then caused a collision); *Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779, 789 (5th Cir. 2003) (denying limitation where the corporation failed to train the captain to use radar, amongst other failures); *Gautreaux v. Scurlock Marine, Inc.*, 84 F. 3d 776, 783-84 (5th Cir. 1997), *vacated in part on other grounds*, 107 F.3d 331 (5th Cir. 1997) (refusing to limit liability because the petitioner had privity or knowledge of the
negligence when the owner failed to train its relief captain on the proper operation of an electric winch, which caused the relief captain's injuries); *Verret v. McDonough Marine Services*, 705 F.2d 1437, 1444 (5th Cir. 1983) (denying limitation of liability where a vessel owner did not provide a competent master and crew and ensure that the ship was seaworthy).
[12] *See Archer Daniels Midland Co. v. M/V Freeport*, 705 F. Supp. 1197, 1204 (E.D. La. 1988).
[13] *See In re Int'l Marine, LLC*, 614 F. Supp. at 740.

> the safety of passenger vessels moored or anchored in the Mississippi River . . .
>
> (f)(3)(iii) Before embarking a pilot [sic] when entering or getting under way in the [Restricted Navigation Area ("RNA")], *the master shall ensure that the chief engineer has certified* that the following additional operating conditions will be satisfied so long as the vessel is under way within the RNA: . . . *Main propulsion machinery is available to immediately respond to the full range of maneuvering commands* and any load-limiting programs or automatic acceleration-limiting programs that would limit the speed of response to engine orders beyond that needed to prevent immediate damage to the propulsion machinery are capable of being overridden immediately.

This regulation was a "*means of knowledge of which the shipowner is bound to avail himself.*" Crowley violated this regulation in two ways: The Chief Engineer failed to make the required certification, and the load limiter could not be completely disabled such that the vessel was "available to immediately respond to the full range of maneuvering commands." The Chief Engineer testified he never certified that the vessel was capable of immediately responding to the full range of maneuvering commands on May 16, 2019. Captain Bonvino confirmed he never received such certification. In perhaps a more egregious instance of inaction, Crowley failed to inform the Chief Engineer that his assigned duties included such certification in the first place, and, consequently, he was unfamiliar with this statutory obligation. In fact, Crowley itself did not understand the limiters affecting the Vessel's engines and could not impart any meaningful information to the crew.

Crowley's unfamiliarity with its own equipment is particularly salient considering the Coast Guard's admonition in 33 U.S.C. § 165.810 and the circumstances of this accident. Some of the most critical events on the night of the accident occurred between VDR time 1:35:10, when Pilot Woodford ordered "bring it up to slow when you can," the 32-second delay when Captain

Bonvino physically entered Pilot Woodford's engine order, and the 9 seconds thereafter that the engine struggled to attain even 47 (10 RPMs shy of slow ahead). Multiple witnesses testified that the current overcame the Vessel in this moment, when both the Captain failed to timely follow the Pilot's slow-ahead command, and the Vessel's machinery sluggishly responded to engine orders. As the four-to-five knot current continued dominating the Vessel, Pilot Woodford called for more power at VDR time 01:36:39. At this time, the Vessel still had not attained the RPMs associated with the "slow ahead" engine order, much less the 9 knots speed-through-the-water Captain Keijer reported was needed to outmaneuver the current.

Regulation 33 U.S.C. § 165.810 was specifically intended to "assist in the prevention of allisions." The Crowley representative testified it knew of this regulation. The regulation was also cited in Mariners Safety Information Bulletins ("MSIB") issued in 2015 and 2018. The MSIBs were an attempt by the Coast Guard to remind mariners of this regulation, especially considering the high-river conditions that impacted the community in those years (and in 2019). In the 2018 MSIB, the Coast Guard specifically provided: "Prior to entering or transiting the Mississippi River, the attending Pilot shall be provided information on how any load-limiting programs or automatic-acceleration-limiting programs affect the operation of the main propulsion plant and the mechanism/procedure used to override the system should that become necessary for safe navigation." Crowley did not ensure this occurred.

Crowley testified that it received the 2015 and 2018 MSIBs and that they were applicable to the Vessel. Initially, Crowley incorrectly testified in trial that it sent the MSIBs to the crew. Conrad Kuiken, as the Crowley representative, was then impeached with deposition testimony, in which he stated there was no proof Crowley actually provided the MSIBs to the crew. Regardless of whether Crowley physically sent the MSIBs or not, Crowley never directly or indirectly

educated the crew on the matters contained therein. As a result, the Captain/crew did not convey any of the required information in the MSIBs to Pilot Woodford, and the Chief Engineer did not know he was required to certify any limiting programs on the engine were capable of being immediately overridden.

Crowley and APTX violated a second regulation: 33 CFR § 164.11(k). This regulation requires,

> The owner, master, or person in charge of each vessel underway shall ensure that: . . . (k) If a pilot other than a member of the vessel's crew is employed, the pilot is informed of the draft, *maneuvering characteristics*, and peculiarities of the vessel and of any abnormal circumstances on the vessel that may affect its safe navigation.[14]

Crowley did not ensure the Vessel's crew alerted Pilot Woodford of the Vessel's engine limiters, which are maneuvering characteristics that demonstrably affected the Vessel's ability to safely navigate on May 16, 2019.

The trial testimony showed that the Vessel's limiters were "maneuvering characteristics," as contemplated by this regulation. The confusing presentation of CoCos documentation by Jason Fernandes established, at the very least, there are numerous, complex engine output data. This data showed the responsiveness of the engine was not controlled by the master or crew, but rather the unknown mechanisms of the Kongsberg automation system. These mechanisms were unclear to any witness, and they manifested in unpredicted ways on the night of the accident. The complex interaction of limiters in the Kongsberg system demonstrates sufficiently unique "maneuvering characteristics" to trigger a second statutory violation.

During trial, Crowley tried to cast doubt as to whether a limiter affected the engine's propulsion on the night of the accident. Again, Crowley's own engineer confirmed that multiple

---

[14] Emphasis added.

limiters control the engine. The Captain and various crew members also testified to personally observing the effect of limiters on the engine on other occasions. Additionally, Crowley updated its master-pilot card to include a provision about the Vessel's limiters. Finally, there was no viable explanation at trial as to why the engine required over one minute after the slow ahead order was input at 01:35:52 to achieve the slow-ahead RPMs (which are shown on the pilot card). If the Pilot were alerted to the delayed responsiveness of the system, he would have likely altered his subsequent actions, including the timing of his release of the stern tug.

### III.     Conclusion

ADM Entities proved half-a-dozen independent paths that defeat Vessel Interests' limitation action. Should the Court find that one path dead ends, the others remain open. ADM Entities must prove only one act of negligence or unseaworthiness proximately caused the accident, but the burden then shifts to Vessel Interests to prove absence of privity or knowledge thereof. Vessel Interests failed to satisfy this burden. Vessel Interests' numerous statutory violations and failures to train speak for themselves. As such, ADM Entities request this Court find Vessel Interests are not entitled to exoneration from or limitation of liability under 46 U.S.C. §§ 30501, *et seq*.

Respectfully submitted:

SALLEY, HITE, MERCER & RESOR, LLC

*/s/ Morgan E. Kelley*
DAVID M. FLOTTE, T.A. (#1364)
MARCELLE P. MOULEDOUX (#30339)
KEVIN M. FREY (#35133)
AUSTIN S. GLASCOE (#38236)
MORGAN E. KELLEY (#38299)
365 Canal Street, Suite 1710
New Orleans, LA 70130
Tel.: (504) 566-8800
Fax: (504) 566-8828
dflotte@shrmlaw.com
mmouledoux@shrmlaw.com
kfrey@shmrlaw.com
aglascoe@shmrlaw.com
mkelley@shmrlaw.com

*Counsel for Archer Daniels Midland Company d/b/a ADM Grain Company, ADM International Sàrl, and American River Transportation Co., LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2021, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all persons electronically noticed.

*/s/ Morgan E. Kelley*
MORGAN E. KELLEY