# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ARCHER DANIELS MIDLAND, CO., ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-10525 C/W 19-10925, 19-11813, 19-12748** |
| **M/T AMERICAN LIBERTY** | **SECTION "L" (1)** |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

This matter arises out of multiple allisions[1] that occurred around 8:00 pm local time on May 16, 2019 when the fully laden tanker, the M/T AMERICAN LIBERTY, lost control and contacted moored vessels, barges, and wharfs along the left descending bank from mile 139.5 to 138.7 AHP on the Lower Mississippi River near Reserve, Louisiana. The incident gave rise to several lawsuits in this Court as well as state court seeking to recover for property damage and personal injuries. This, in turn, led to the filing of limitation proceedings and claims in those proceedings. All of the cases were transferred and consolidated in this Court.

The Court bifurcated the consolidated case into two phases: (1) liability, limitation, and allocation of fault and (2) damages. The first phase of this case, the liability-limitation-and allocation of fault phase, came before this Court without a jury on May 17 through May 21, 2021. The Court has carefully considered the testimony of all witnesses, the exhibits entered into evidence during the trial, and the relevant entries in the record. Pursuant to Rule 52(a) of the

---

[1] "An allision is a collision between a moving vessel and a stationary object." *In re Mid-S. Towing Co.*, 418 F.3d 526, 529 (5th Cir. 2005) (citing THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW, § 14–2 (4th ed. 2004)).

Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.

To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such.  To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

### FINDINGS OF FACT

### I.  THE PARTIES

### A.  Petitioners in Limitation:

1. American Petroleum Tankers X, LLC ("APTX") and Crowley Global Ship Management, Inc. ("Crowley") are Petitioners in Limitation in the case entitled *In the Matter of American Petroleum Tankers X LLC and Crowley Global Ship Management, Inc*., Civil Action No. 19-10925. ATPX is a limited liability company formed pursuant to the laws of Delaware and the owner of the M/T AMERICAN LIBERTY, an oil/chemical tanker bearing IMO No. 9763851 sailing under the flag of the United States of America. R. Doc. 392, Uncontested Facts, at ¶¶ 4, 16. Crowley is a corporation formed pursuant to the laws of Delaware and is the operator or owner *pro hac vice* of the AMERICAN LIBERTY. *Id.* at 7. APTX and Crowley are collectively referred to as the "AMERICAN LIBERTY Interests."

2. E.N. Bisso & Son, Inc. and Bisso Offshore, LLC (collectively, E.N. Bisso) are Louisiana companies and Petitioners in Limitation in the case entitled *In the Matter of E.N. Bisso & Son, Inc., and Bisso Offshore, LLC*, Civil Action No. 19-11813. E.N. Bisso is the owner and operator of the M/V JOSEPHINE ANNE and M/V VERA BISSO, which were engaged as assist tugs on the night of the incident. R. Doc. 392, Uncontested Facts, at 8.

3. Associated Terminals, LLC and Associated Marine Equipment, LLC (collectively, Associated) are Louisiana companies and Petitioners in Limitation in the case designated as *In the Matter of: Associated Marine Equipment, LLC et al*, Civil Action No. 19-12748. Associated is the owner and/or operator of the crane barge Don D, which was struck and damaged during the allisions. R. Doc. 392, Uncontested Facts, at ¶¶ 42-46. Associated Terminals, LLC was the employer of Clement Bell, Robert Sayles and Ryheme Knighten, who were crewmembers onboard the Crane Barge DON D. *Id.*

### B. Claimants in the Limitation Proceedings:

4. Archer Daniels Midland Co., d/b/a ADM Grain Co. (ADM), ADM International Sarl (ADMI), and American River Transportation Co., LLC (ARTCO) are collectively referred to as the "ADM Entities." The ADM Entities filed claims in the limitation proceeding brought by the owner and operator of the AMERICAN LIBERTY. R. Doc. 55. The ADM Entities also asserted claims in the limitation proceeding of E.N. Bisso, the owner of the VERA and JOSEPHINE, the tugs assisting the AMERICAN LIBERTY, R. Doc. 67, and cross claims against Marathon Petroleum Company LP, R. Doc. 325.

5. ADM is a corporation organized under the laws of Delaware. ADM's principal place of business is in Illinois, but it is authorized to and is doing business in Louisiana. R. Doc. 392 at 6. ADM operates a grain elevator facility in Reserve, Louisiana, near Mile Marker 139 AHP in the Lower Mississippi River. *Id.* ADM's dock sustained damage as a result of the incidents giving rise to this litigation. *Id.* ADMI is ADM's international trading and operating arm in Europe. *Id.* ADMI is a company organized and existing under the laws of Switzerland, with its principal place of business in Rolle, Switzerland. *Id.* ADMI chartered the M/V EVER GRACE, which was loading cargo at ADM's grain facility at the time of the incident. *Id.* The

M/V EVER GRACE sustained damage by the allision. *Id.* ARTCO is a company organized and existing under the laws of Delaware, with its principal place of business in Illinois. *Id.* ARTCO was the owner and operator of stationary cargo barges located in a barge fleet near the ADM grain elevator facility in Reserve, Louisiana (hereafter the ARTCO fleet). *Id.* at 6-7. The ARTCO fleet sustained property damage as a result of the Incident. *Id.* at 7.

6. Associated Terminals, LLC and Associated Marine Equipment, LLC have asserted claims against the owners and operators of the AMERICAN LIBERTY and E.N. Bisso for recovery of maintenance and cure paid to its employees, which has been partially settled. R. Docs 53; 69. They also filed cross claims against Marathon Petroleum Company LP. R. Doc. 322.

7. Clement Bell, Ryheme Knighten, and Robert Sayles were working aboard the DON D and the AFRICAN GRIFFON at the time of the allision. Bell, Knighten, and Sayles have made claims against the AMERICAN LIBERTY Interests, Associated, and E.N. Bisso in their respective limitation proceedings. R. Docs. 33; 42; and 136.

8. Port of South Louisiana is a political subdivision of the State of Louisiana that owns two docks at or near Reserve, Louisiana which were damaged in the incident of May 16, 2019. R. Doc. 392, Uncontested Facts, at ¶ 37. Port of South Louisiana, along with its Insurers, have filed claims for property and economic damages flowing from the incident.

9. ADM Insurers and Ascot Underwriting Limited and other Underwriters are insurers who insured ADM, ADMI, and ARTCO for damage to their property and business interruption and who will be subrogated to the claims being asserted by their insureds to the extent claims are paid. *Id.* at 9.

10. Brandon Woodford is a Louisiana resident and was a federal pilot provided to the AMERICAN LIBERTY by the Associated Federal Pilots. R. Doc. 392, Uncontested Facts, at ¶¶ 21, 90.  A

pilot was required by law to be onboard the vessel for her undocking and subsequent passage through the Mississippi River. *Id.* at ¶ 21. Pilot Woodford is a third-party defendant by way of a third-party complaint filed by APTX and Crowley R. Doc. 167.

11. Marathon Petroleum Company LP ("Marathon") is a limited partnership organized under the laws of the State of Delaware and is doing business in Louisiana. R. Doc. 392 at 11. Marathon was the time charterer of the AMERICAN LIBERTY pursuant to a charter party agreement ("Charter Party") dated January 6, 2017 and entered into between Marathon and APTX. R. Doc. 392, Uncontested Facts, at ¶ 5. Marathon seeks contractual defense and indemnity from APTX pursuant to the Charter Party. R. Doc. 291. Marathon also seeks indemnity, contribution, and reimbursement under general maritime law against Crowley, Associated, and E.N. Bisso, as well as a determination that it is not liable unto any claimant. R. Docs. 291-93.

## II.  THE INCIDENT ON MAY 16, 2019

12. This unfortunate saga begins on the evening of May 16, 2019 when the AMERICAN LIBERTY, pursuant to a time charter with Marathon, prepared to get underway after loading petroleum cargo at the Marathon facility located on the east bank of the Mississippi River near Reserve, Louisiana for transport to Tampa Bay, Florida. R. Doc. 392, Uncontested Facts, at ¶¶ 11, 17, and 39-41.

13. The AMERICAN LIBERTY was moored starboard side to the Marathon Dock No. 2 at mile 140.2 AHP on the left descending bank with the bow pointed upriver.  On May 16, 2019, the Reserve water height gage showed the Mississippi River at flood stage of 23.4 feet.[2] R. Doc. 392, Uncontested Facts, at ¶ 29. The estimated current in that area was between 4 and 6 knots (5 to 7 miles per hour). Trial Testimony of Bonvino; Rivera. When the current runs in the same

---

[2] The data indicates that flood stage is water heights in excess of 22 feet at that gage. R. Doc. 392, Uncontested Facts, at ¶ 29

direction as a vessel is going, the vessel's speed needs to exceed the speed of the current in order to respond to the rudder movements and effectively steer. Generally, as the river height increases, the river runs faster. Trial Ex. 33 at 1.

14. As a result of the high river conditions, the New Orleans Baton Rouge Pilots Association (NOBRA) had issued a moratorium on its pilots assisting vessels in disembarking after sunset on the Mississippi River between Mile Markers 88.0 AHP and 234 AHP, an area which includes the Marathon docks. Trial Ex. 54.

15. In anticipation of the AMERICAN LIBERTY's departure from the Garyville Dock on May 16, 2019, local agents of the vessel ordered a Federal Pilot, Federal 35 Brandon Woodford ("Pilot Woodford") and ordered two assist tugs owned by E.N. Bisso, the M/V JOSEPHINE ANNE and M/V VERA BISSO. Master-Pilot Checklist, Trial Ex. 11. Pilot Woodford was a member of Federal Pilots and Docking Masters of Louisiana, which is distinct from NOBRA and not governed by its rules. *Id.* at ¶ 90.

16. The bridge of the AMERICAN LIBERTY was manned with the following crewmembers in addition to Pilot Woodford: Master: Capt. Craig Bonvino; Bridge Watch Officer: Third Mate Connor McDaniel; and Helmsman: AB Anito Rarugal. *Id.* at ¶ 18. The vessel's Safety Management System, the Tanker Vessel Operations Manual (VOM), outlines Crowley policy for Bridge Resource Management. *Id.* at ¶ 20.

### A. The M/T AMERICAN LIBERTY Particulars

17. The AMERICAN LIBERTY is an ocean going, double hull, oil/chemical IMO Type II tanker. The vessel was built at the Aker Shipyard in Philadelphia, PA and was delivered to APTX on July 26, 2017. R. Doc. 392, Uncontested Facts, at ¶ 12. The AMERICAN LIBERTY particulars

are 601.3' in length by 105.7' in width. *Id.* at ¶ 13. She had a draft of 36'-9" even keel when she departed Dock 2. *Id.*

18. The AMERICAN LIBERTY is equipped with a single Man B&W 655 OME engine. *Id*. at ¶ 10. The manufacturers boast that this engine is fuel efficient, environmentally friendly, and can be coupled with acceleration software systems that moderate or limit the acceleration of the engine to obtain these goals.

19. One such acceleration system is manufactured by Kongsberg and was the type that was installed on the AMERICAN LIBERTY when she was delivered to APT in 2017. R. Doc. 392, Uncontested Facts, at ¶ 10. This system is guided by an Engine Order Telegraph ("EOT") in both the bridge of the ship and the engine room. The EOT can be likened to a throttle on a leisure craft; it has a lever that can be moved to adjust the ship's Revolutions Per Minute ("RPMs") to common positions such as Stop, Dead Slow Ahead, Slow Ahead, Half Ahead, Full Ahead and Navigation Speed. All of these points have a corresponding RPM. *See* Trial Ex. 18; 275.

20. When the EOT is moved to any particular setting, the Kongsberg system electronically or digitally controls the amount of fuel, air and other inputs into the engine to limit the rate at which the engine can attain requested RPM for both ecological and efficiency reasons. Trial Testimony of Fernandes; Gupta. Simply stated, the Kongsberg system controls, or limits, the rate at which the engine on the AMERICAN LIBERTY can accelerate.

21. Recognizing that there may be times when it can be dangerous for a vessel maneuvering to have such a limitation on the engine, the Kongsberg system included a feature that is called "Cancel Limits" which is activated by a button on the EOT. This button serves to increase the

limits on the engine, providing a 10% increase of certain thresholds. Trial Testimony of Fernandes; Gupta.

22. The AMERICAN LIBERTY is also equipped with a Voyage Data Recorder ("VDR") that records data, including radar, speed, vessel position, rate of turn, bridge communication, and VHF radio communication. VDR also captures the Electronic Chart Display Information System (ECDIS) data with radar overlay, passage plan waypoints, and alarms. In addition, the ship is equipped with a bell logger that records information from the Engine Order Telegraph ("EOT"). R. Doc. 392, Uncontested Facts, at ¶ 34.

### B.  Pre-Voyage and the Master-Pilot Information Exchange

23. Pilot Woodford boarded the vessel on May 16, 2019 at about 8:00 p.m. (2000 hours). *Id.* at ¶ 24. At the time, Pilot Woodford had been a Federal Pilot for almost two years. As is typical for most pilot associations, he served the first year as an apprentice, where he rode with other pilots, and then served for over ten months as a probationary pilot, where he rode alone but was subject to certain graduated draft restrictions. *See* Trial Testimony of Woodford; Trial Exs. 284; 285.

24. Pilot Woodford had served as a pilot on the AMERICAN LIBERTY at least eight time before this accident and had never experienced a lack of engine responsiveness. His prior experience undocking from the Marathon Dock No. 2 specifically was with only two tankers, both of which occurred during the daytime and when the river height was lower and the current benign. *Id.*

25. Pilot Woodford and Capt. Bonvino, the Captain of the AMERICAN LIBERTY, conducted a Master-Pilot Information Exchange ("MPX"). A MPX takes place before the vessel gets underway to ensure that the pilot is properly and adequately informed so that the bridge team

is coordinated for the transit. Cowley shoreside management issued a "Master/Pilot Checklist" to its crew that required important topics to be specifically addressed with a pilot, including tug positioning/tug power; the intended passage navigation plan; and tide, currents, and weather forecasts. Trial Ex. 11. As part of this process, a Pilot Card—also internally created by Crowley shoreside management—is presented to a pilot. A pilot card includes the information necessary for a pilot to effectively advise the master of the vessel as the vessel transits the Mississippi River. A local pilot brings local knowledge of the transit conditions; however, the vessel must inform the pilot of the vessel's unique characteristics, particularly as they pertain to maneuvering. Trial Ex. 18.

26. During the MPX, there was no discussion of how long it would take the vessel to progress from one engine order to the next, and no discussion of when the tugs would be released. Trial Ex. 41. This information was not listed on the Pilot Card, and the Master/Pilot Checklist did not remind the master to discuss these issues. Trial Exs. 11, 18. Capt. Bonvino testified that both of these issues should have been discussed with the Pilot during the MPX. Trial Testimony of Capt. Bonvino. He also testified that if the Master/Pilot Checklist included the time needed to progress between engine orders, he would have discussed it with the Pilot. *Id*.

27. In addition to the MPX, a Voyage Passage Plan was prepared by Second Mate Joel Kinkel and approved by Capt. Bonvino prior to departure. Trial Ex. 33; 34. The purpose of a Voyage Passage Plan is to establish a navigational procedure to pre-plan a vessel's route and monitor its progress along the route. It is necessary that the plan be thorough and detailed to allow all bridge navigation watch members, including the Pilot, to foresee potential problems and plan a strategy to avoid or minimize risks. Nevertheless this Voyage Passage Plan did not contain any specific details regarding (1) the turn within the River; (2) warnings regarding the potential

hazards posed by the flood stage condition of the River; (3) the anticipated set of the current towards the East Bank after departure from the dock; or (4) the fact that the passage would occur during night time, contrary to the safety advice of the local NOBRA Pilots Association, which counseled against nighttime departures with the River in its current flood stage.

### C.  Departure from the Berth

28. The VERA BISSO and JOSEPHINE ANNE assisted in the AMERICAN LIBERTY's move from the dock and turn downriver for transit to the Gulf of Mexico. The JOSEPHINE was placed on the port bow of the AMERICAN LIBERTY and connected with its line, and the VERA was stationed at the port quarter of the vessel without a line. Trial Ex. 11. All commands to the JOSEPHINE ANNE and VERA BISSO originated from Pilot Woodford and were communicated to the tugs through hand-held radios on an as-needed basis. R. Doc. 392, Uncontested Facts, at ¶¶ 76-77.

29. At approximately 20:30 (local time 8:30 pm), the lines securing the AMERICAN LIBERTY to the dock were let go, and the vessel was pulled laterally away from the dock. *Id.* at ¶ 28. With the help of the JOSEPHINE and VERA, the AMERICAN LIBERTY began a top-around maneuver. The VERA was ordered to push the stern upriver while the JOSEPHINE pulled the bow around. As the ship moved away from the dock, Capt. Bonvino confirmed with the Third Mate on deck that the swing looked good and that they were all clear of the dock by about 125 feet. Trial Ex. 77 at 2. At 20:33:24, Pilot Woodford ordered "All Stop" to allow the pivot to continue without the ship moving too far out into the river. Trial Ex. 41 at 10. Shortly after the "All Stop" order, Capt. Bonvino, who had been outside on the starboard bridge wing, came into the bridge at approximately 20:33:55. VDR Recording, Trial Ex. 80.

30. At 20:34:14, the VERA was directed to stop pushing the stern around. Trial Ex. 41 at 10. The vessel was past the halfway point of the top-around maneuver. Four seconds later, the VERA acknowledged that she had complied with the order and asked the AMERICAN LIBERTY: "Do you want us to back away?" *Id.* This inquiry can only be interpreted to mean this was a usual point at which a stern tug would disengage from the maneuver. Pilot Woodford responded at 20:34:21: "You can go ahead and back away. Thank you." *Id.* At the time, the Pilot was standing on the bridge near the Captain. Trial Testimony of Woodford; Bonvino. Immediately thereafter, at 20:34:23, Pilot Woodford asked for a "Dead Slow Ahead" to the begin ship's progress out into the river. Trial Ex. 41 at 10.

31. At 20:35:10, Pilot Woodford requested an increase in RPMs from "Dead Slow Ahead" (40 RPMs) to "Slow Ahead" (57 RPMs) in order to further increase speed and progress out into the river. Trial Exs. 18; 41 at 10. In giving this order, the Pilot said, "Bring her up to slow when you can," expecting to get the full Slow Ahead 57 RPMs in 5-15 seconds, since that was what he had experienced on other occasions. Trial Ex. 41 at 10; Trial Testimony of Woodford. Expert testimony at trial confirmed this was a reasonable assumption.[3] Pilot Woodford had also been told by Captain Bowers, the alternate captain of the AMERICAN LIBERTY, that the AMERICAN LIBERTY could get all the RPMs he needed at any time. Trial Testimony of Woodford. At no time prior to this point had Capt. Bonvino or anyone on the vessel advised Pilot Woodford that the vessel would not be able to quickly respond to this command.

---

[3] Crowley representative Kuiken testified that he would expect to receive the slow ahead within 15 seconds "in these conditions." Experts Keijer, Fazioli, and Rivera all testified that the reasonable expectation for a vessel to reach slow ahead bells was within a 15 second range. Crowley's expert Fernandez testified that he would expect the slow ahead bell to be achieved in a eight seconds based on his review of the case and particularly the maneuvering board posted on the bridge and/or the maneuvering booklet.

32. In response to the Pilot's order, Capt. Bonvino said, "Yeah, we'll probably need a while, especially with the current." Trial Ex. 41 at 10; Trial Testimony of Bonvino. This was the first time the Pilot was told anything about an expected delay. The Pilot had already released the VERA tug because he expected the vessel would provide thrust immediately upon request. Trial Testimony of Woodford. Capt. Bonvino did not ask to clarify Pilot Woodford's order.

33. Instead, Capt. Bonvino walked over to look at the ECDIS, and after a 32-second delay, put his hand on the Engine Order Telegraph and executed the Slow Ahead order. Trial Testimony of Bonvino. He also then, for the first time since being undocked, pressed the "cancel limits" button. Trial Ex. 23. About one minute later, (a total of one minute and thirty-two seconds) the requested RPM increase took effect.[4] Trial Ex. 42. But it was too late. The current now controlled the vessel, which was setting toward the East Bank.

34. At this point chaos erupted on the Bridge. The Pilot gave various orders in an attempt to minimize the impending allisions, and the Captain superseded these orders with his own instructions in an attempt to get back on course. Trial Ex. 77 at 7-10. At one point, the Captain ordered his crew, "Don't listen to the pilot." *Id*. at 8. All to no avail.

35. At 20:38, Pilot Woodford called for the VERA to return to assist, but the VERA could not reach the port bow without putting herself in harm's way, given the AMERICAN LIBERTY's distance to the bank and the Josephine's continued presence at the port bow. Trial Ex. 41 at 12; Trial Testimony of Woodford. It then became clear that the JOSEPHINE was in a dangerous position between the tanker and the docks, so Pilot Woodford ordered the JOSEPHINE to get out of harm's way. *Id*. Moments before the first allision, the crew on the

---

[4] By 20:36:55, over a minute after the Slow Ahead engine order was entered at 20:35:52, the engine had only reached 54 RPMs. Trial Ex. 42.

AMERICAN LIBERTY finally released the JOSEPHINE ANNE's line and the JOSEPHINE moved to a place of safety.

36. The AMERICAN LIBERTY allided with the crane barge DON D, the M/V AFRICAN GRIFFON, and the M/V EVER GRACE, which then contacted the ADM Reserve grain facility. The AMERICAN LIBERTY then allided with a barge fleet operated by ARTCO and a dock owned by the Port of South Louisiana. R. Doc. 392, Uncontested Facts, at ¶ 12. The ship eventually came to rest and was moored at the Holcim/Globalplex dock at Mile Marker 139 AHP Lower Mississippi River. *Id.* at ¶ 38.

## CONCLUSIONS OF LAW

### I.  Jurisdiction

1. This case arises under the Court's admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. In addition, the Court also has jurisdiction pursuant to 28 U.S.C. § 1333. Venue is proper in the Eastern District of Louisiana.

### II.  Limitation of Liability

2. The Limitation of Liability Act, 46 U.S.C. §§30501, *et seq.*, allows a shipowner to limit its liability to the value of the vessel at the conclusion of the voyage, plus any pending freight if it had no privity or knowledge of any unseaworthy condition or negligent act that that was a proximate cause of the accident.  "When a court determines whether a shipowner is entitled to exoneration or limitation of liability, it employs a two-step process." *Continental Insurance Company v. L&L Marine Transportation Inc.*, No. 14-2967, 2017 WL 4844272, at *3 (E.D. La. Oct. 26, 2017) (quoting *Farrell Lines, Inc. v. Jones*, 530 F.2d 7, 10 (5th Cir. 1976)). "First, the party seeking to dissolve limitation must establish that the vessel was negligent or unseaworthy, and those acts caused the accident." *Id.* (citing *Petition of Kristie Leigh Enterprises, Inc.*, 72 F.3d 479, 481 (5th Cir. 1996)). Then, "the burden shifts to the owner of

the vessel to prove that negligence [or unseaworthiness] was not within the owner's privity or knowledge." *Id.* (citing *In re Hellenic*, 252 F.3d 391, 395 (5th Cir. 2001)).

3. To establish a negligence claim under admiralty law, claimants must show (1) there was a duty owed to claimants by the defendant; (2) the defendant breached that duty; and (3) the breach caused the claimant's alleged damages. *In Re Mid–S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005). "The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized maritime customs and usages." *Stolt Achievement, Ltd. v. Dredge B.E. LIND HOLM,* 447 F.3d 360, 364 (5th Cir. 2006). The outcome-determinative questions for the Court in this allision case involve: (1) breach of the duty of care and (2) causation, including the sub-elements of cause in fact and proximate or legal cause. *In Re Mid–S. Towing Co.*, 418 F.3d at 532.

4. If claimants succeed, the limitation petitioners then bear the burden of demonstrating a lack of privity or knowledge.  "[A] shipowner has privity if it personally participated in the negligent conduct or brought about the unseaworthy condition." *Trico Marine Assets Inc. v. Diamond B Marine Services Inc.*, 332 F.3d 779, 789 (5th Cir. 2003) (citing *Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F.2d 1465, 1473 (5th Cir. 1991)). "Knowledge, when the shipowner is a corporation, is judged not only by what the corporation's managing officers actually knew, but also by what they should have known with respect to conditions or actions likely to cause the loss." *Pennzoil*, 943 F.2d at 1473-74.

This consolidated case involves three limitation proceedings. The Court will address each in turn.

**A.  LIMITATION OF LIABILITY OF THE M/T AMERICAN LIBERTY**

1. The AMERICAN LIBERTY Interests seek complete exoneration from liability for claims arising out of the allisions involving the M/T AMERICAN LIBERTY, and alternatively, claim the benefits of limitation of liability under 46 U.S.C. §§ 30501 *et seq.* R. Doc. 1 in Civil Action No. 19-10925.

### i. *Negligence*

2. "Liability for collisions on the navigable waters is [often] governed by a series of presumptions and burden-shifting principles." *Illinois Constructors Corp. v. Logan Transp., Inc.,* 715 F. Supp. 2d 872, 879 (N.D. Ill. 1989). The first presumption applicable to this case is that a moving vessel is deemed to be presumptively at fault for an allision when it allides with a stationary object. *The Oregon,* 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895). The moving vessel may rebut the presumption by showing, with a preponderance of the evidence, that the allision was the fault of the stationary object, that the moving ship acted with reasonable care, or that the allision was an unavoidable accident. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 503 (5th Cir. 1994) (citing *American Petrofina Pipeline Co. v. M/V Shoko Maru,* 837 F.2d 1324, 1326 (5th Cir. 1988)).

3. Turning to the instant case, the Court finds that the application of the *Oregon* rule is appropriate. The AMERICAN LIBERTY breached its duty of care under admiralty law by negligently alliding with numerous fixed objects, including the DON D; the M/V AFRICAN GRIFFON; the M/V EVER GRACE, which then contacted the ADM elevator grain facility. The vessel further allided with a moored barge fleet operated by ARTCO and a dock owned by the Port of South Louisiana.[5] The Vessel Interests presented no credible evidence that would

---

[5] The Court recognizes, however, that the *Oregon* rule does not relieve the Plaintiff of the burden of demonstrating causation. *See In Re Mid–S. Towing Co.,* 418 F.3d 526, 532 (5th Cir. 2005). Rather, this presumption "speaks explicitly only to a presumed breach on the part of the allided vessel." *Id.*

rebut this presumption. Even apart from the presumption set forth in the *Oregon* rule, though, the Court finds that the AMERICAN LIBERTY was negligent and breached its duty of care.[6] The bridge crew of the AMERICAN LIBERTY demonstrated poor Bridge Resource Management[7] while attempting a top-around maneuver at night in high river conditions. These errors included, among other things, failing to discuss the intended maneuver thoroughly, to communicate orders clearly, to ask for clarification, to maintain situational awareness, and to execute orders promptly. In so doing, the crew allowed the current to overcome the vessel, which eventually allided with other moored vessels, barges, and wharfs along the East Bank of the Mississippi River.

4.  The Court also finds that the *Pennsylvania* rule is applicable.[8] The *Pennsylvania* rule is burden-shifting presumption for causation when a vessel "at the time of a collision is in actual violation

---

[6] The Court also acknowledges that "evidentiary presumptions ... are designed to fill a factual vacuum. Once evidence is presented ... presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions. *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)

[7] Crowley's VOM describes the important of good Bridge Resource Management as a "key component of safe navigation":

> "Effective Bridge Resource Management must leverage all resources that are available on the bridge and promote **good communication** and teamwork. The fundamental requirement of BRM is the maintenance of a **proper lookout**. Quality Bridge Resource management requires all members of the bridge team to engage the team in the safe and effective navigation of the vessel." (emphasis added).

Trial Ex. 144, VOM, Part 05-010 § 2.1.

[8] In *In Re Mid–South Towing Co.,* the Fifth Circuit provided a thorough analysis of the relationship between the *Oregon* rule and the *Pennsylvania* rule:

> It is important to distinguish ... between the presumption of fault announced in *The Oregon* and the presumption of causation announced in *The Pennsylvania;* the latter case holding that a vessel in violation of a statutory rule designed to prevent collisions bears the burden of showing 'not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.' *The Pennsylvania,* 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873). *Compare* SCHENBAUM, ADMIRALTY & MARITIME LAW § 14–3, at 104–05 (classifying the rule of *The Oregon* as a 'presumption of fault' akin to the common law doctrine of *res ipsa loquitor* 'primarily applicable in allision cases,' which creat[es] a rebuttable presumption of *negligence* on the part of a party who is in exclusive control of an instrumentality with regard to a mishap that ordinarily does not occur in the absence of negligence' (emphasis added) *with id.* at § 14–3, at 101 (classifying the rule of *The Pennsylvania* as not establishing a rule of fault but as being '*limited to causation*') (emphasis added), *and* DAVID W. ROBERTSON ET AL., ADMIRALTY & MARITIME LAW IN THE UNITED STATES 384 (2d ed.2001) (describing the rule of *The Pennsylvania* as creating a strong presumption that the statutory violation was a cause in fact of the

of a statutory rule intended to prevent collisions. *Mike Hooks Dredging Co. v. Marquette Transp. Gulf-Inland, L.L.C.*, 716 F.3d 886, 891 (5th Cir. 2013) (quoting *The Pennsylvania*, 86 U.S. 19 Wall. 125 (1974)). "C.F.R. regulations are treated as statutory violations for purposes of the *Pennsylvania* Rule where those regulations apply." *Tokio Marine & Fire Ins. Co., Ltd. v. M/V FLORA*, 235 F.3d 963, 966 (5th Cir. 2001).

5.  The United States Coast Guard ("USCG") issued a Marine Safety Information Bulletin ("MSIB") on March 19, 2018 that directed vessel owners and operators as follows:

> Recently, the Captain of the Port (COTP) New Orleans has received several reports of vessels underway in the lower Mississippi River with a main engine unable to immediately achieve maximum head revolutions as requested by the Pilot onboard. [I]t was determined that the main engines were all in good working order, but were unable to answer the full range of commands because of some type of automatic acceleration limiting program that prevented the main engine from responding immediately.

As a result, in accordance with 33 C.F.R. § 165.810 pertaining to the regulated navigation area on the Mississippi River, the Coast Guard mandated:

> Main propulsion machinery must be available to immediately respond to the full range of maneuvering commands and that any load limiting programs or automatic acceleration-limiting programs that would limit the speed of response to engine orders beyond that needed to prevent immediate damage to the propulsion machinery are capable of being overridden immediately. Prior to entering or transiting the Mississippi River, the attending pilot shall be provided information on how any load limiting programs or automatic acceleration-limiting programs effect the operation of the main propulsion plan and the machinery/procedure used to override the system should that become necessary for safe navigation

*See* Trial Ex. 43; 33 C.F.R. § 168.10(f)(3)(ii).

---

accident,' and distinguishing this rule from the common-law concept of negligence per se famously applied in *Martin v. Herzog,* 228 N.Y. 164, 126 N.E. 814 (1920) (Cardozo, J.)).
*In Re Mid–S. Towing Co.,* 418 F.3d at 531, n. 5.

6.  The USCG reissued the MSIB on February 13, 2019, just under 3 months before the incident in question. Trial Ex. 43. Both MSIB's invoked 33 C.F.R. § 165.810[9], which states: "Before embarking a pilot when entering or getting underway in the RNA, the master of each vessel shall ensure that the vessel is in compliance with 33 C.F.R. Part 164." 33 C.F.R. § 164.11, entitled "Navigation Underway: General" provides in relevant part:

> "The owner, master, or person in charge of each vessel underway shall ensure that:"
>
> * * *
>
> (k) If a pilot other than a member of the vessel's crew is employed, the pilot is informed of the draft, maneuvering characteristics, and peculiarities of the vessel and of any abnormal circumstances on the vessel that may affect its safe navigation.

7.  Here, the AMERICAN LIBERTY Interests failed to provide a vessel that was immediately capable of responding to engine orders at least from Dead Slow Ahead to Slow Ahead and (by its captain) failed to initiate those engine orders immediately, and failed to advise Pilot Woodford in advance of the maneuvering characteristics, peculiarities, or other abnormal circumstances on the vessel that may affect its safe navigation, particularly with respect to the delay in increasing RPMs. The Vessel Interests and its crew were required to provide this information regardless of its cause. They did not and this failure was a proximate cause of the incident.

8.  Having reviewed the witnesses' testimony, the exhibits admitted into evidence, and the parties' briefing, the Court finds that, even in the absence of the above presumptions, the actions and inactions of the bridge crew of the AMERICAN LIBERTY, specifically their poor communication and Bridge Resource Management, constituted a breach of its duty of care and proximately caused the allisions on the evening of May 16, 2019.

---

[9] This federal regulation was promulgated "to assist in the prevention of allisions, collisions, and groundings." 33 C.F.R. § 165.810(a).

9.  "A compulsory pilot's negligence is attributable to the vessel." *SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 765 (E.D. La. 2019). "Generally, only the vessel is liable *in rem* for the pilot's negligent acts; however, the shipowner is liable *in personam*, in addition to the vessel's liability *in rem*, if the negligence of the master or crew contributed to the accident." *Id.* (citing *Probo II London v. M/V ISLA SANTAY*, 92 F.3d 361, 365 (5th Cir. 1996)).

10. There is evidence to support the conclusion that the Pilot released the stern tug, the M/V VERA BISSO, too soon and that this was a precipitating event which eventually caused the allisions.[10] Nevertheless, under the law and Crowley policy, a pilot is only an advisor and his presence does not free the master of his ultimate responsibility for the safe navigation of the vessel. *The Oregon*, 158 U.S. 186, 195, 15 S.Ct. 804, 39 L.Ed. 943 (1895); Trial Ex. 36, VOM, Part 05-007 §2.1. Furthermore, the master must ensure that his officers and crew duly attend to the pilot's advice and the master is bound to keep a vigilant eye on the navigation of the vessel. *Osprey Ship Management, Inc. v. Foster*, 387 F.Ap'x 425, 433 (5th Cir. 2010); *Avondale v. International Marine Carriers, Inc.*, 15 F.3d 489, 492-93 (5th Cir. 1994).

11. Both Pilot Woodford and Capt. Bonvino were on the bridge at the time of the VERA's release, and the pilot was right next to the captain.[11] Capt. Bonvino and the Third Mate[12] had a duty to be situationally aware during the maneuver. Thus, the evidence supports the conclusion that Capt. Bonvino knew or should have known that the stern tug was released. Capt. Bonvino was negligent in failing to monitor the position of the tugs or to take corrective action if he

---

[10] The combined horsepower of the two Bisso tugs was almost equal to the horsepower of the AMERICAN LIBERTY itself, and expert testimony indicated that the two tugs could have gotten the AMERICAN LIBERTY into the navigation channel. Trial Ex. 11; Trial Testimony of Jay Rivera.

[11] Capt. Bonivno testified that he was "four feet away from the pilot" at the time the VERA was released. Trial Testimony of Bonvino.

[12] The Officer on Watch should develop and maintain situational awareness of the area around the ship, the ship's activities, and the possible impact of external influences on the safety of the ship. *See*, Trial Ex. 254, International Chamber of Shipping, Bridge Procedures Guide, at §3.8, p.43.

determined a tug was released prematurely. *Osprey Ship Mgmt. Inc. v. Foster*, 387 F. App'x 425, 433 (5th Cir. 2010) ("[T]he master must at least know enough about what is going on with his vessel and its journey so as to evaluate the compulsory pilot's performance.").

12. Capt. Bonvino also erred by failing to ask for clarification when Pilot Woodford ordered "Bring her up to slow when you can." Trial Ex. 41 at 10; Trial Testimony of Woodford; Bonvino. This order was vague and deviated from the standard marine communication phrases promulgated by the International Maritime Organization. Trial Ex. 375. Upon orders from a pilot, however, the captain must (1) respond immediately or (2) seek clarification. Trial Testimony of Kuiken; Keijer; Fazioli. Rather than seeking clarification, Capt. Bonvino delayed 32 seconds before physically inputting the "Slow Ahead" engine order. Trial Ex. 42. The engine then took an additional minute to respond.[13] *Id.* Federal regulations and Crowley policy require the crew to execute engine orders promptly as given.[14] Capt. Bonvino provided no explanation for his delay in execution, which allowed the flood-stage current to irretrievably overcome the vessel.

13. The crew was further negligent by not executing additional engine orders as given and, in fact, executing orders that were never given by the Pilot. This is problematic in view of Capt. Bonvino's testimony that he never intended to "take over the conn."[15] Trial Testimony of Bonvino. In other words, Capt. Bonvino gave his own conflicting orders to the crew and failed to advise Pilot Woodford as to the orders he was entering. This communication breakdown was a significant error in violation of basic Bridge Resource Management Principles that led

---

[13] In fact, over a minute later, the engine had only reached 54 RPMs, still short of the 57 RPMs for Slow Ahead.

[14] 33 CFR § 164.11(h) requires that the "owner, master, or person in charge of each vessel underway shall ensure that:" "Engine speed and direction orders are executed as given." Expert testimony at trial confirmed that seconds and inches can be outcome-determinative in marine navigation. Trial Testimony of Rivera.

[15] Crowley policy requires that "[w]hen the Master takes over the conn of the vessel, they shall clearly indicate this fact to the Bridge Watch Officer…"[t]his transfer of the conn shall be made known to all bridge watch personnel." Trial Ex. 144, VOM, Part 05-008 § 1.30.

to confusion and chaos on the bridge of the AMERICAN LIBERTY and was a cause of the allisions.

## ii. *Privity and Knowledge*

14. The chain of errors that led to this unfortunate incident began shoreside prior to the AMERICAN LIBERTY disembarking the dock. "Knowledge or privity of supervisory shore personnel is sufficient to charge a corporation." *China Union Lines, Ltd. v. A. O. Andersen & Co.*, 364 F.2d 769, 787 (5th Cir. 1966). Moreover, privity or knowledge "extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation." *In re Signal Int'l, LLC*, 579 F.3d 478, 496 (5th Cir. 2009) (internal citations omitted). The following failures indicate that the crew's negligence during the May 16, 2019 incident was within the privity and knowledge of the Vessel Interests.

15. First, Crowley shoreside management failed to include relevant information on the Pilot Card or Master/Pilot Checklist, particularly about engine response times or engine limitations.[16] Trial Exs. 11; 18. According to Crowley's Director of Marine Operations, the purpose of the Master/Pilot Checklist is to remind the master to discuss characteristics of the vessel that are important for safe navigation. Trial Testimony of Kuiken. It is undisputed that a vessel owner, and its properly trained crew, are in a better position to know a vessel's maneuvering characteristics and peculiarities than a pilot, who boards hundreds of vessels per year.[17] To the extent the vessel's engine response times are relevant to a maneuver and would impact the use of tugs, they must be provided to a pilot and discussed in advance. Trial Testimony of Bonvino;

---

[16]The undisputed testimony at trial was that Crowley Global Ship Management was responsible for drafting and revising the Pilot Card and the Master-Pilot Exchange Checklist. Trial Exs. 11; 18.

[17] Crowley's vessel operations manual requires that the Master and Bridge Watch Officers shall be fully familiar with the maneuvering characteristics of the vessel, including the main engine RPM's… Trial Ex. 37, VOM, Part 05-011 § 1.18

Kuiken. That was not done here. Captain Bonvino testified that if the Checklist had included these topics, he would have discussed them with the Pilot before departure. Trial Testimony of Bonvino.

16. Second, Crowley failed to train the AMERICAN LIBERTY's crew on the function and operation of the Konsberg automatic engine system. *See Complaint of Bowmech Marine, Inc.*, 1992 WL 266098, at *3 (E.D. La. Sept. 24, 1992) ("With respect to the competency of a vessel's crew, 'privity will exist if the owner fails to train the crew or fails to make appropriate inquiries as to the crew's competence.' The training a crewmember should receive includes knowledge of the 'operation and capacities of the vessel.'") (internal citations omitted). Capt. Bonvino testified that he typically pushed the "cancel limits" button before undocking; however, there was no company policy involving the Kongsberg system, engine limitations, or when to activate cancellation thereof. Trial Testimony of Capt. Bonvino. In fact, there was no consistent description to any Crowley crewmember or employee as to whether the limitations on the engines can be overridden and to what extent.

17. The unfamiliarity of the Vessel's crew with its own equipment is particularly salient considering the Marine Safety Information Bulletins ("MSIBs") that had been issued by the Coast Guard prior to this incident. Trial Ex. 43. Crowley management was on notice that vessels had experienced slow engine response times, and Crowley should have taken steps to ensure that the master discussed this with the pilot during the Master/Pilot Exchange. Crowley and its crew had a duty to the pilot to advise him of these maneuvering characteristics, peculiarities, and abnormal conditions that affect the safe navigation of the vessel and failed to do so here. *See* 33 C.F.R. 1911(k) and all expert testimony.

18. Multiple witnesses testified that the current overcame the AMERICAN LIBERTY when both the Captain failed to timely follow the Pilot's Slow-Ahead command, and the vessel's machinery sluggishly responded to engine orders. Ultimately, there was no conclusive explanation at trial as to why the engine required over one minute to achieve the Slow-Ahead RPMs. In any event, had the Pilot been alerted to the delay in getting the full revolutions from Dead Slow Ahead to Slow Ahead and the delayed responsiveness of the system, he would have ordered the Slow Ahead order earlier or refrained from releasing the stern tug when he did. Trial Testimony of Brandon Woodford.

19. The foregoing failures of Crowley were negligent and directly caused this accident. Because the negligence was within the privity and knowledge of Crowley, the Vessel Interests have failed to carry their burden of establishing a lack of privity and knowledge. Therefore, the Vessel Interests are not entitled to limit their liability under 46 U.S.C. §§ 30505.

## B. LIMITATION OF LIABILITY OF THE M/V JOSEPHINE ANNE

1. E.N. Bisso filed a petition seeking exoneration, or alternatively, limitation of liability, for the incident involving the JOSEPHINE ANNE and the VERA BISSO on May 16, 2019 when the AMERICAN LIBERTY allided with marine facilities.[18] At the close of Claimants' evidence, E.N. Bisso orally presented its Rule 52(c) Motion for Judgment on Partial Findings, which the Court granted. R. Doc. 489. "Judgment on partial findings entered under Rule 52(c) is to be made after the district court has heard all of the 'evidence bearing on crucial issues of fact.'" *Samson v. Apollo Resources, Inc.,* 242 F.3d 629, 632 (5th Cir. 2001) (Fed. R. Civ. P.

---

[18] The Limitation Petition filed by E.N. Bisso references only one assist tug—the JOSEPHINE ANNE. Because two tugs owned by E.N. Bisso were intimately involved in the Incident and mentioned in various claims, the Court will discuss limitation issues as they pertain to both tugs.

52(c) advisory committee's notes). A court entering judgment pursuant to Rule 52(c) "must find the facts specially and state its conclusions of law separately" as described in Rule 52(a), and the Court takes this opportunity to do so. Fed. R. Civ. P. 52(c) (citing Fed. R. Civ. P. 52(a)(1)).

### i. *Negligence*

2. Assist tugs have a duty to "promptly execute the orders of the tow's commander or here, the person in charge of the [piloted vessel]." *Bisso v. Waterways Transp. Co.*, 235 F.2d 741, 746 (5th Cir. 1956). In other words, assist tugs have a duty "to follow the orders of others rather than taking action on their own." (citing *Crowley Am. Transp., Inc. v. Double Eagle Marine, Inc.*, 208 F. Supp. 2d 1250, 1267 (S.D. Ala. 2002); *Hobson v. Guido Tugboat & Salvage Corp.*, 1997 WL 263735, at * 5 (D. Mass. May 2, 1997) (citing *Baker, Carver & Morrell Ship Supplies, Inc. v. Mathiasen Shipping Co., Inc.,* 140 F.2d 522, 525 (2d Cir. 1944))). "Chaos would indeed prevail if a helper tug either did, or felt under compulsion to determine, what that tug from its limited point of view thought ought to be done." *Bisso*, 235 F.2d at 746 (citing *Moran Towing & Transportation Co. v. Empresa, Hondurena de Vapores*, 31 F.2d 963 (5th Cir. 1929)).

3. Where a vessel attended by assist tugs is involved in a collision, the Fifth Circuit Court of Appeals has outlined the duties and liabilities of the assist tug as follows:

> [The tug] was bound to obey orders from the CONNECTICUT, and no part of the responsibility of the navigation, so far as the approaching vessel was concerned, was on her. It was not her duty to signal the movements of the CONNECTICUT, under whose exclusive control she was. The CONNECTICUT is alone responsible for the consequences of her own faults.

*THE CONNECTICUT*, 103 U.S. 710, 26 L.Ed. 467 (13 Otto 710-714) (1880). An assist tug is "bound to obey the orders of the pilot," particularly regarding the piloted vessel's "proper place in the river." *In re: Walsh*, 136 F. 557, 558 (5th Cir. 1905).

4. In the present case, the assist tugs JOSEPHINE ANNE and VERA BISSO promptly performed each executable order of Pilot Woodford on the night of the Incident; thus, the Court finds the assist tugs satisfied their duty of care.

5. An assist tug may be exonerated from liability provided the tug obeyed all orders and was not guilty of negligence, either in the manner of executing the orders or by participating in an obviously dangerous maneuver. *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 527 F. Supp. 824, 834 (E.D. La. 1981), *aff'd*, 699 F.2d 240 (5th Cir. 1983) (citing *Dow Chemical Co. v. Tug THOMAS ALLEN*, 349 F. Supp. 1354 (E.D. La. 1972)). In the instant case, Claimants have failed to meet their burden of proof to demonstrate liability on behalf of E.N. Bisso for the allisions. No testimony of any expert has attributed fault for the Incident to any negligence of the JOSEPHINE ANNE, the VERA BISSO, or their respective crews. Nor was any evidence presented to show any negligence whatsoever on the part of the assist tugs causing or contributing to the cause of this allision and resulting damage. The Court finds that the credible evidence supports the conclusion that the JOSEPHINE ANNE and VERA BISSO acted reasonably under the circumstances.

6. Therefore, for the reasons discussed above, E.N. Bisso & Son, Inc. and Bisso Offshore, LLC as owner and operator of the M/V JOSEPHINE ANNE, are hereby exonerated from liability for this allision and the resulting damages.

### C. LIMITATION OF THE DON D

1. The third limitation action involves Associated Terminals, LLC and Associated Marine Equipment, LLC (collectively, "Associated"). Associated, as "the owners and/or operators of the Crane Barge DON D,"[19] seeks exoneration from or limitation of liability for all damages

---

[19] Associated Terminals, LLC petitioned for limitation as an owner *pro hac vice* of the Don D by virtue of its significant management and operational control over the vessel. *See* R. Doc. 448. No evidence produced at trial and no stipulated fact agreed to by the parties proves this fact. It is undisputed that Associated Marine Equipment, LLC was an owner of the Don D at the time of the Incident.

incurred as a result of the May 16, 2019 allision. R. Doc. 1 in Civil Action No. 19-12748 at ¶ IX. PI Claimants filed claims in Associated's Limitation Proceeding for "unseaworthiness and negligence under the Jones Act and general maritime law." R. Doc. 136. at 11, ¶ 10.

2. Prior to this consolidated action, PI Claimants had filed a Petition for Damages in the Civil District Court for the Orleans Parish against a number of defendants, including Associated. R. Doc. 1 in Civil Action No. 19-12748, at ¶ X. In accordance with the stay provision of the Limitation Act, a restraining order was entered enjoining those proceedings. R. Doc. 4 at 3 ¶ 6 in Civil Action No. 19-12748.

3. Notably, the PI Claimants were not the only parties that proceeded to trial with claims pending against Associated. Marathon asserted claims against Associated for tort contribution/indemnity related to PI Claimants' claim against it and Associated asserted a similar counterclaim against Marathon. R. Docs. 292; 322. Moreover, Associated is a claimant against the AMERICAN LIBERTY Interests for its own damages (recoupment of maintenance and cure paid to PI Claimants) and tort contribution/indemnity. R. Doc. 53.

4. Accordingly, this case presents a classic example of the "recurring and inherent conflict" between the Limitation of Liability Act and the Saving to Suitors Clause in the 1789 Judiciary Act's grant of admiralty jurisdiction. *In re* Dammers, 836 F.2d 750, 754, 1988 AMC 1674, 1678 (2d Cir. 1988); *see also Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 439, 121 S. Ct. 993, 996, 148 L. Ed. 2d 931 (2001). On the one hand, the Saving to Suitors Clause, 28 U.S.C. § 1331(1), has been interpreted to allow maritime plaintiffs to bring suit in a forum of their choosing, including state court, with a jury, as traditionally allowed under common law. *See Odeco Oil & Gas Co., Drilling Div. v. Bonnette*, 74 F.3d 671, 674 (5th Cir. 1996) (Odeco II) ("The saving to suitors clause evinces a preference for jury trials and common law remedies in the forum of the claimant's choice.") However, the Limitation Act grants to vessel

owners the statutory right to have their right to limit liability determined exclusively by federal courts. Therefore, when a maritime plaintiff seeks a state court forum for its claim against a vessel owner—as was done in this case—but the vessel owner files a limitation action in federal court—as was done here—the two statutes collide.

5. A limitation petition initiates a concursus proceeding. The limitation court "stays all related claims against the shipowner pending in any forum and requires all claimants to timely assert their claims in the limitation court.'" *In re Diamond Servs. Corp.*, 2021 WL 100717, at \*2 (quoting *Magnolia Marine Transp. Co., Inc. v. Laplace Towing Corp.*, 964 F.2d 1571, 1575 (5th Cir. 1992)). "The court takes jurisdiction to entertain those claims without a jury and ensures that the shipowner who is entitled to limitation is not held to liability in excess of the amount ultimately fixed in the limitation suit (the limitation fund)." *Id.* "The court's primary concern is to protect the shipowner's absolute right to claim the Act's liability cap, and to reserve the adjudication of that right in the federal forum." *Id.* "However, when a shipowner is not exposed to potential liability in excess of the limitation fund, the shipowner's absolute right to limit its liability is not implicated, and the saving-to-suitors clause dictates that the admiralty court must allow suits pending against the shipowner in other fora to proceed." *Id.* (citing *Complaint of Port Arthur Towing Co. on Behalf of M/V Miss Carolyn*, 42 F.3d 312, 316 (5th Cir. 1995)). "Additionally, a court may permit claims to proceed outside of the limitation action where 'all claimants stipulate that the federal court has exclusive jurisdiction over the limitation proceeding, and that the claimants will not seek to enforce a damage award greater than the value of the ship and its freight until the shipowner's right to limitation has been determined by the federal court.'" *Id.* (citing *Odeco II*, 74 F.3d 671, 674 (5th Cir. 1996)).

6. With this jurisprudential backdrop, courts have fashioned two alternate solutions to resolve, to the extent possible, the tension between the Limitation Act and Savings to Suitors Clause.

The first solution is for all claimants to enter stipulations or other binding agreements sufficient to protect the vessel owner's right to a federal forum to determine its right to limit its liability, or sufficient to ensure that the vessel owner's right to limit its liability is not imperiled. *See e.g.*, *Lake Tankers Corp. v. Henn,* 354 U.S. 147 (1957); *Matter of Falcon Inland, Inc*., 2 F. Supp. 2d 835, 837 (E.D. La. 1998). The second solution, employed with more frequency in recent years, is to bifurcate the case, trying the vessel owner's liability and right to limitation in federal court, and allowing the claimant to return to the forum of its choice for a determination of damages. *See In re Athena Const., LLC*, No. CIV A 06-2004, 2007 WL 1668753, at *6 (W.D. La. June 6, 2007) ("[I]t appears that the preferred approach, at least within federal district courts of the Fifth Circuit, is to decide the limitation issues and then allow claimants to return to state court if they so desire.") *See also Matter of Complaint of Bergeron Marine Serv., Inc*., No. CIV. A. 93-1845, 1994 WL 236374, at *1 (E.D. La. May 24, 1994); *In re Suard Barge Serv., Inc*., No. 96-3185, 1997 WL 358128, at *2 (E.D. La. June 26, 1997); *In re Mississippi Limestone Corp.*, 2010 WL 4174631, at *3 (N.D. Miss. Oct. 7, 2010).

7.  Here, the PI Claimants chose the second solution by filing a motion for bifurcation. *See* R. Doc. 89. The Court granted the motion and concluded it would decide liability, limitation, and apportionment of fault in this proceeding. R. Docs. 162; 449. Based upon this ruling, only the issue of damages was left for resolution through a state court jury trial. *Id.*

8.  The parties' pretrial submissions made clear that Associated's liability would be determined at the limitation bench trial before this Court.[20] At no point before the trial in this Court had any claimant proposed stipulations to protect the vessel owners' rights under the Limitation

---

[20] *See* PI Claimants' Proposed Findings of Fact and Conclusions of Law, R. Doc. 421; Associated's Proposed Findings of Fact and Conclusions of Law, R. Doc. 422; Joint Pretrial Order, R. Doc. 392.

Act and to proceed in state court on both liability and damages. It was only after this Court concluded a trial to determine whether Associated is liable for their injuries that PI Claimants sought to propose stipulations to allow a second liability trial in state court. *See* R. Doc. 494.

9. All claimants must enter the appropriate stipulations in order to deprive a vessel owner of its right to a federal forum to determine its right to limitation. *In re ADM/Growmark River System, Inc.*, 234 F.3d 881, 885-86 (5th Cir. 2000)*; see generally* Madeleine M. Landrieu, *Stipulations: Sidestepping the Limitation of Shipowners' Liability Act*, 23 Tul. Mar. L. J. 429 (1999). The Fifth Circuit has previously held that "parties seeking indemnification and contribution from a shipowner must be considered claimants within the meaning of the Limitation Act." *Odeco II*, 74 F.3d 671, 675, (5th Cir. 1996)). In the present case, Marathon also has a claim against Associated "for indemnity, contribution, and/or reimbursement for all amounts, liabilities or judgments that may be assessed to Marathon." R. Doc. 292 at 8. Accordingly, Marathon must have agreed to PI Claimants' proposed stipulations in order for the claims against Associated to return to state court.

10. Furthermore, this Court has found no jurisprudential support for the proposition that a party may proceed through a federal limitation trial on both liability and limitation against a vessel owner, fail to present any evidence of the vessel owner's fault, and then enter a stipulation to allow for a second trial in state court on the issue of vessel owner liability. Therefore, the Court finds PI Claimants' post-trial stipulations untimely and insufficient.

### i. *Negligence*

11. The undisputed facts before the Court, without additional testimony or evidence, are insufficient to support a finding that the DON D was unseaworthy or that their employer was

negligent under any of PI Claimants' theories.[21]   Despite relying solely on their own deposition testimony to support their claims and listing themselves as May Call Witnesses in the Joint Pretrial Order, the PI Claimants did not testify at trial. *See* R. Docs. 399; 392 at 135. In fact, they called no witnesses and offered no exhibits at trial on the issue of Associated's liability. Thus, PI Claimants failed to meet their burden of proof at trial to support a liability case against Associated. Because no evidence was presented regarding Associated's liability for claimants' damages, the owner and/or operator of the crane barge the Don D must be exonerated from all claims asserted.

## F.   THIRD PARTY DEFENDANT

1.   The AMERICAN LIBERTY Interests brought a Third-Party Complaint against Pilot Woodford for gross negligence.[22] R. Doc. 167.

2.   Gross negligence is defined as "willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence." *Houston Expiration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528, 531 (5th Cir. 2001); *Belala v. Coastal Towing Co*., No. Civ. A. 01-3137, 2002 WL 31729491, at *2 (E.D. La. Dec. 3, 2002). Courts have described gross negligence as the "entire absence of care" or the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." *Hendry Corp. v. Aircraft Rescue Vessels*, 113 F. Supp. 198, 201 (E.D. La. 1953). Mere inadvertence or honest mistake does not amount to gross negligence. *See Orthopedic Sports Injury*, *supra*, 922 F.2d at 224, n. 3.

---

[21] PI Claimants provide four theories of liability: (1) Associated failed to train the crew on emergency collisions and how to safely evacuate a vessel; (2) Associated failed to provide its crew with a reasonable safe means to evacuate the DON D; (3) Associated positioned the crane in such a way that denied the crew the benefit of seeing inbound traffic, in violation of Inland Navigational Rules 5 and 8; and (4) Associated failed to establish a policy and/or train its crew to thoroughly inspect the mooring cables and ropes. R. Doc. 421 at 11.
[22] Despite a 14(c) tender, no other party has asserted affirmative claims for negligence against Pilot Woodford.

3.  The Court finds that Pilot Woodford's actions during the May 16, 2019 incident did not rise to the level of gross negligence. Accordingly, the Vessel Interest's Third-Party Complaint against him is dismissed with prejudice.

4.  Furthermore, by way of defense, the AMERICAN LIBERTY Interests suggest that the Pilot was negligent and that they lack privity and knowledge of such negligence. Here, Pilot Woodford's actions, though inadequate, were informed by the crew's failure to (1) understand and advise him on the vessel's limitations and maneuvering characteristics and (2) promptly execute the order given by him. As a result, due to this negligence of the Master and crew, any action or inaction by Pilot Woodford is attributable to the vessel *in rem* and the shipowner *in personam*. *Probo II London v. Isla Santay MV*, 92 F.3d 361, 365 (5th Cir. 1996).

### D.  CLAIMS AGAINST MARATHON

1.  In addition to the claims filed in the Vessel Owners limitations proceedings, there were also claims filed against Marathon, a non-Vessel Owner. The Court must now address the liability of Marathon as the time charterer of the AMERICAN LIBERTY and owner of the Garyville departure dock. Various claimants assert cross claims against Marathon for negligence and seek to hold Marathon jointly liable for the allisions. *See* R. Docs. 322; 325; 326; 327; 328; 330.

2.  "A time charter is not generally liable for claims of negligence of the crew or for the unseaworthiness of the vessel; however, a time charterer may be liable for its own negligence in its capacity as time charterer." *Westmoreland v. Venice Marine & Outdoor Consultants, Inc.*, No. CV 17-6220, 2018 WL 2045434, at *3 (E.D. La. May 2, 2018) (citing *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993)). The Fifth Circuit has recognized that a time charterer has a "hybrid duty," arising from contract and tort, "to avoid

negligent actions within the sphere of activity over which it exercises at least partial control." *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1520 (5th Cir. 1996). "The traditional spheres of activity in which a time charterer exercises control and thus owes a duty include choosing the vessel's cargo, route, and general mission, as well as the specific time in which the vessel will perform its assignment." *Id.* Notably, "the parties may vary the traditional assignment of control by contract or custom." *Id.*

3. The evidence presented at trial supports the conclusion that Marathon did not exceed the bounds of a traditional time charterer. The AMERICAN LIBERTY did not have any discussions with anyone at Marathon about when to leave the dock on the night of May 16, 2019. Rather, the Court finds that the decision to leave at night on May 16, 2019 was a routine decision that was made as part of the AMERICAN LIBERTY's normal course of operations based upon when cargo loading was completed. This decision was made exclusively by Capt. Bonvino, who testified that he had no misgivings or concerns about leaving Marathon's Garyville facility on the night of the incident. Trial Testimony of Capt. Bonvino.

4. With respect to the specific allegations of fault asserted by the various claimants against Marathon, the Court concludes that no evidence was presented at trial establishing that Marathon knew of the vessel's automation system or that Marathon collected financial penalties from APTX for increased fuel consumption and/or late arrivals or departures from Marathon docks, which would support the conclusion that they profited from an early departure or in any way insisted on or forced or even suggested an early departure. Moreover, Crowley policy requires that its crew prioritize safety over speed and economic considerations. Trial Testimony of Kuiken, Trial Ex. 36, VOM Part 05-007, § 1.1.  In fact, any guarantees as to a certain speed or set amount of fuel consumption applied only during transits from sea buoy to

sea buoy, as noted in Clause 24 and Attachment 1 of the Charter Party, not while the AMERICAN LIBERTY was navigating in the Mississippi River. Trial Ex. 84.

5. For the reasons stated, the Court holds as a matter of law that Marathon did not breach any duties owed as a time charterer and was therefore not at fault for the May 16, 2019 incident. The Court concludes that Marathon is not liable to any claimants, and that all claims asserted against Marathon are dismissed with prejudice.

## E. DEFENSE AND INDEMNITY

1. Marathon seeks contractual defense and indemnity from APTX pursuant to the Charter Party. R. Doc. 291.

2. "Express contractual indemnity agreements generally are enforceable under maritime law" and are governed by the "usual rules of contractual interpretation." *Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 834 (5th Cir. 1992). Given the clear and unambiguous terms of the Charter Party, and the Court's findings that the claims asserted against Marathon are bodily injury and property damage claims that arise out of and in connection with the Charter Party and the operation of the AMERICAN LIBERTY, the Court holds that Marathon's defense and indemnity claim against APTX is available and enforceable under General Maritime Law.

3. Because Marathon was not at fault for the May 16, 2019 incident and resulting damages, the Court finds that APTX is required to defend and indemnify Marathon "against any loss, damage, claim, suit, liability, penalty, fine, judgment, cost or expense (including reasonable attorney fees and other costs of litigation)" related to or arising out of the cross claims asserted against Marathon. Trial Ex. 84, Cl. 56. The Court also finds that Marathon is entitled to insurance coverage under APTX's P&I and Hull insurance policies, and that such insurance policies are responsive to the Claims asserted against Marathon. *Id.* Marathon is required to

present the necessary evidence and proof of any such loss and damages to the Court for further consideration and award at the damages aspect of this litigation at a later date.

<b><u>CONCLUSION</u></b>

Based on the foregoing findings of fact and conclusions of law, the Court finds that the negligence attributable to the M/T AMERICAN LIBERTY was the proximate cause of the May 16, 2019 allisions. Any action or inaction of Pilot Woodford, for whom Capt. Bonvino is responsible, was precipitated by his lack of information due to the inadequacy of the Master/Pilot Checklist and Pilot Card. The Vessel Interests' Third-Party Complaint against Defendant Pilot Woodford is dismissed with prejudice.

The Court also finds that the AMERICAN LIBERTY Interests had privity and knowledge of the acts of negligence; therefore, they are not entitled to limitation of liability under the Limitation of Liability Act, 46 U.S.C. § 30511.

The Court finds that the assist tugs were not negligent, and accordingly, E.N. Bisso is not liable for the allisions. The Court grants E.N. Bisso's petition for exoneration from liability.

The Court also finds that no fault or negligence was demonstrated on behalf of Associated, and accordingly, grants Associated's petition for exoneration from liability.

The Court finds that Marathon was not negligent and therefore is not liable to any claimants. All claims asserted against Marathon are dismissed with prejudice.

New Orleans, Louisiana, this 25th day of June, 2021.

_____
UNITED STATES DISTRICT JUDGE
