UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ARCHER DANIELS MIDLAND, CO., ET AL** | **CIVIL ACTION** |
| VERSUS | NO. 19-10525 C/W 19-10925, 19-11813, 19-12748 |
| **M/T AMERICAN LIBERTY** | **SECTION "L" (1)** |

## ORDER AND REASONS

Before the Court is a motion to strike the purported rebuttal expert report of Dr. Colin Carter filed by Defendants Crowley Global Ship Management, Inc. and American Petroleum Tankers X, LLC (collectively, "Defendants" or "Vessel Interests"). R. Doc. 670. Plaintiffs Archer Daniels Midland Company d/b/a ADM Grain Company ("ADM"), ADM International Sarl ("ADMI"), and American River Transportation Co., LLC ("ARTCO") (collectively, "Plaintiffs" or "ADM-Related Entities") oppose the motion. R. Doc. 672. After holding an expedited hearing on the motion, the Court permitted the parties to submit additional briefing. The Vessel Interests thereafter filed a supplemental memorandum,[1] as did the ADM-Related Entities. R. Doc. 700. Considering the parties' briefing, the record, and the applicable law, the Court now issues this Order and Reasons.

I.   **BACKGROUND**

This case arises from a maritime casualty on the Mississippi River. The Court previously

---

[1] This document, which the Court has carefully reviewed, is set to be docketed under seal at virtually the same time that this order is to be entered. Because of the time-sensitive nature of this motion, the Court has moved to rule on it expeditiously and cannot wait for the sealed filing to be docketed. Accordingly, while the Court has carefully reviewed and considered this submission, the Court is unable to cite to this filing by its docket number, which, again, it has yet to receive as of the writing of this order.

bifurcated the proceeding into two phases: a liability, limitation, and apportionment-of-fault phase followed by a damages phase. The Court held a bench trial on the first phase and made the following Findings of Fact and Conclusions of Law pertinent to the pending motion. R. Doc. 503. On May 16, 2019, the M/T AMERICAN LIBERTY, an oil/chemical tanker, owned by American Petroleum Tankers X, LLC, and owned *pro hac vice* by Crowley Global Ship Management, Inc., left a facility owned by Marathon Petroleum Company LP in Garyville, Louisiana. *Id.* at 6, 32. Soon after leaving her berth, the AMERICAN LIBERTY lost control and contacted moored vessels, barges, and wharfs along the left descending bank from mile 139.5 to 138.7 AHP on the Lower Mississippi River near Reserve, Louisiana. *Id.* at 1.

As a result, the AMERICAN LIBERTY allided with the crane barge DON D, the M/V AFRICAN GRIFFON, and the M/V EVER GRACE, which then contacted a grain elevator facility operated by ADM in Reserve, Louisiana, near Mile Marker 139 AHP in the Lower Mississippi River. *Id.* at 3, 13. The AMERICAN LIBERTY then allided with a barge fleet that was owned and operated by ARTCO and which was located near ADM's grain elevator. *Id.* at 13. The ship eventually came to rest and was moored at the Holcim/Globalplex dock at Mile Marker 139 AHP Lower Mississippi River. *Id.*

The Court determined that negligence attributable to the M/T AMERICAN LIBERTY was the proximate cause of the allisions at issue in this case and that the Vessel Interests were not entitled to limitation of liability. *Id.* at 15, 23. With the first phase of this case concluded, the matter is now proceeding to a bench trial on damages, including on ADM-Related Entities' claims against the Vessel Interests.

## II. PRESENT MOTION

On May 31, Plaintiffs produced to Defendants a 39-page report by their agricultural commodities economist, Dr. Colin Carter, ("the First Carter Report"). On June 30, 2022, the

Vessel Interests produced to the ADM-Related Entities a 27-page report by Dr. Steven Sexton, the Vessel Interests' expert in the same field ("the Sexton Report"). On August 8, 2022, Plaintiffs produced a second report from Dr. Carter that is styled as a "Rebuttal Report" to the report of Dr. Sexton ("the Second Carter Report). The Vessel Interests now move to strike Dr. Carter's 41-page purported rebuttal expert and to preclude Dr. Carter from offering any opinions contained in that report at trial. R. Doc. 760. In their motion, the Vessel Interests contend that the Second Carter Report is untimely under the Federal Rules of Civil Procedure and that they are substantially prejudiced by the report's disclosure. R. Doc. 670.

The Court held an expedited hearing on Defendant's motion. R. Doc. 674. The Court observed that it had not yet been provided with the First Carter Report, the Sexton Report, nor the Second Carter Report. *Id.* Accordingly, the Court ordered these documents to be submitted in order to determine whether the Second Carter Report qualifies as a valid rebuttal report within the meaning of the Rules. The Court also permitted the parties to file supplemental briefing addressing this issue. Last, the Court explained that if the Second Carter Report does in fact constitute a permissible rebuttal report, then it shall not be stricken and the report shall be deemed part of Dr. Carter's direct testimony and Dr. Carter may testify at trial on the contents of that report. The Court reasoned that, although the Second Carter Report—if indeed it is a rebuttal report—is untimely under the Rules, Defendants nonetheless are not prejudiced by it because they "have the same amount of time to review the report—9 days—before Dr. Carter's deposition that they would have had if the report had been timely issued based on the originally-scheduled date of Dr. Carter's deposition." *Id.* at 2.

In their supplemental briefing in favor of striking the Second Carter Report, the Vessel Interests contend that this report is not a proper rebuttal report because it exceeds the scope of

3

the Sexton Report and instead attempts to fill in gaps in the First Carter Report by adding new methodologies, data, graphs, and opinions. As alternative relief, Defendants argue that the Court should bar the Second Carter Report from being introduced at trial as part of Dr. Carter's direct examination because otherwise Plaintiffs would effectively have two opportunities to rebut Dr. Carter—once through the Second Carter Report and again during cross-examination. And if the Court declines this relief, Defendants request that Dr. Sexton be afforded the opportunity to respond to the new opinions and methodologies contained in the Second Carter Report.

In opposition, ADM-Related Entities argues that the Second Carter Report is a valid rebuttal report because it "offers no new methodologies or opinions" but instead explains deficiencies in the Sexton Report. Plaintiffs also argue that the first form of alternative relief requested by Defendants—that the Court bar the Second Carter Report from forming part of Dr. Carter's direct testimony—should be denied because excluding the report will leave the Court with an "incomplete picture" of the expert opinions. Additionally, Plaintiffs contend that the second requested alternative relief by Defendants—permitting Dr. Sexton to file a sur-rebuttal report—should likewise be denied because it would be highly unusual to permit such a sur-rebuttal and, moreover, such a report is unnecessary as there are no new opinions in the Second Carter Report to which Dr. Sexton could reply.

### III.   DISCUSSION

The Court first addresses whether the Second Carter Report is an appropriate rebuttal report or instead if it goes beyond the permissible bounds of such a report and enters the territory of an unsanctioned supplemental report. Under the Rules, a rebuttal report is a report "intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." Fed. R. Civ. P. 26(a)(2)(D)(ii). "A 'rebuttal' report explains,

repels, counteracts, or disproves evidence of the adverse party's initial report." *Zoch v. Daimler, A.G.*, No. 4:17-CV-578, 2018 WL 4599674, at *1 (E.D. Tex. Sept. 25, 2018) (quoting *CEATS, Inc. v. TicketNetwork, Inc.*, 2:15-CV-01470, 2018 WL 453732, at *3 (E.D. Tex. Jan. 17, 2018) (internal quotation marks omitted). On the other hand, a rebuttal report is not an opportunity to advance new opinions. *Coward v. Forestar Realty, Inc.*, 282 F. Supp. 3d 1317, 1331 (N.D. Ga. 2017). Courts should exclude impermissible rebuttal reports and testimony. *Zoch, A.G.,* 2018 WL 4599674, at *2.

District courts often consider three questions in determining whether a putative rebuttal report is an actual rebuttal report: "First, what evidence does the rebuttal expert purport to contradict or rebut? Second, is the evidence disclosed as rebuttal evidence on the same subject matter as that identified by another party in its Rule 26(a)(2)(B) disclosure? Third, is the evidence disclosed as rebuttal evidence intended solely to contradict or rebut that evidence?" *Poly-Am., Inc. v. Serrot Int'l, Inc.*, No. CIV.A. 300CV1457D, 2002 WL 1996561, at *15 (N.D. Tex. Aug. 26, 2002). The Court turns, then, to these inquiries.

In this case, the Court finds that the Second Carter Report is clearly a proper rebuttal Report under the Rules. First, the evidence that the Second Carter Report purports to rebut is the Sexton Report's methodology and conclusions regarding the economic damages suffered by ADM. The Sexton Report critiques the First Carter Report, and the Second Carter Report, in turn, responds to these criticisms. Specifically, the Second Carter Report addresses the following supposed errors or shortcomings in the Sexton Report: its (1) conclusion that the First Carter Report "arbitrarily" divides the 21-month timeframe during which ADM sustained economic damages into three distinct periods and to model overall damages based only on the second period ("Period 2"); (2) reliance on an allegedly "inferior" source of grain export data—namely,

data from the USDA Federal Grain Inspection Service ("FGIS") rather than from the USDA Global Agriculture Trade System ("GATS")—to model damages for Period 2; (3) analysis of ADM's ability to divert grains during the damages period to other facilities; and (4) analysis of the impact of the loss of the Reserve facility on ADM's barge operations that allegedly produces absurd real-world results.

Second, the subject matter of the Second Carter Report, as demonstrated by the topics listed above, undoubtedly covers the same subject matter as the Sexton Report. Finally, a review of the contents of the Second Carter Report reveals that this report is intended solely to contradict or rebut Dr. Sexton's report.

Defendants complain that the Second Carter Report injects new data and posits new opinions. The Court disagrees. It is true that the Second Carter Report makes certain assertions that are not present in the First Carter Report. For instance, the Second Carter Report contends that Dr. Sexton's modeling is fundamentally flawed because it relies on what Dr. Carter characterizes as the less reliable and therefore "inferior" FGIS data set in calculating grain exports as opposed to the allegedly more commonly used GATS data set that Dr. Carter cited in his initial report. Defendants point out that Dr. Carter did not mention the FGIS data set in his first report. Thus, Defendants argue that the Second Carter Report's criticism of FGIS as a source of grain data is a "new opinion."

Not so. The Second Carter Report's critique of the Sexton Report's reliance on the FGIS data set does not insert a new opinion so much as attempt to refute Dr. Sexton's methodology and results. In other words, Dr. Carter merely attempts to poke holes in and undermine Dr. Sexton's analysis—which is the precise purpose of a rebuttal report. Furthermore, Dr. Carter had no reason to critique the FGIS source of grain export data in his initial report because he did not

base his analysis on that data set and could not have reasonably predicted that Dr. Sexton would use it as his source of data. In short, the Second Carter Report does not introduce any new opinions; it merely counters Dr. Sexton's report. It therefore constitutes a permissible rebuttal report.

The Court has already explained that if the Second Carter Report is a valid rebuttal report, then it does not prejudice Defendants because they will have the same number of days to review it before Dr. Carter's deposition that they would have had if the Second Carter Report had been issued timely based on the original date for Dr. Carter's deposition. R. Doc. 674. Accordingly, the Court held that, if the Second Carter Report is a true rebuttal report, "it shall not be struck and Dr. Carter [will be] permitted to testify at trial on the opinions contained therein." R. Doc. 674. In this case, the Court will consider experts' reports and depositions to constitute their direct examination testimony in lieu of live testimony. The parties will, of course, be able to conduct live cross-examinations of each witness, including experts.

As noted, Defendants seek to prohibit the Second Carter Report from being introduced at trial as part of Dr. Carter's testimony. But this report is permissible under the Rules. Thus, admitting it at trial in place of live testimony is consistent with the Court's approach to handling all expert testimony. Indeed, it would be anomalous for the Court to find that the report is a valid rebuttal report but at the same time exclude it from forming part of Dr. Carter's direct examination testimony. And to the extent Defendants would have the Court ignore the contents of the Second Carter Report itself but permit Dr. Carter to offer live, direct examination testimony on that report, the Court finds that this would be a poor use of the time and resources, serving only to needlessly consume the trial presentation time that Plaintiffs will be allotted. Finally, the Court rejects Defendants' contention that admitting the Second Carter Report would

place the parties on "unequal footing" because ADM supposedly will be able to rebut Dr. Sexton's testimony twice—once through Dr. Carter's rebuttal report and again on cross-examination—while Defendants will only have a single opportunity to rebut Dr. Carter when they cross-examine him at trial. Defendants ignore that Dr. Sexton's own report responds to Dr. Carter's initial report, challenging Dr. Carter's methodology and conclusions on multiple fronts. The parties thus have the same number of opportunities to rebut their opponents' respective experts.

For this reason, the Court is not inclined to grant Defendants' request for leave to produce a sur-rebuttal report. Defendants' request is premised on two arguments: (1) that the Second Carter Report gives Plaintiffs an unfair advantage in terms of the number of chances they have to rebut their opponents' expert, and (2) the Second Carter Report advances new opinions. Again, both of these assertions have been considered and found wanting. Furthermore, while the Rules expressly contemplate rebuttal reports, the Rules nowhere mention sur-rebuttal reports. And that is for good reason. Continuously allowing expert rebuttal would create a situation "where there would be no finality to expert reports. . . . Such a system would eviscerate the expert report requirements of Rule 26, would wreak havoc in docket control, and would amount to unlimited expert opinion presentation." *D.G. ex rel. G. v. Henry,* No. 08–74, 2011 WL 2881461, at *1–2 (N.D. Okl. July 15, 2011). Understandably, then, permitting sur-rebuttal reports is far from the norm. And though courts sometimes exercise discretion to permit sur-rebuttal reports, the Court finds little reason to do so here where, as discussed, the rebuttal report to which Defendants seek to respond offers no new opinions. Finally, the Court is concerned that permitting Defendants to produce a sur-rebuttal report at this late stage of the litigation, with trial less than three weeks

away, may prejudice Plaintiffs. All told, these considerations weigh strongly against authorizing Defendants to take the unusual step of submitting a sur-rebuttal expert report.

## IV. CONCLUSION

For these reasons,

**IT IS ORDERED** that the Vessel Interests' motion strike the purported rebuttal expert report of Dr. Colin Carter and for all alternative relief sought therein, R. Doc. 670, is **DENIED**.

New Orleans, Louisiana, this 26th day of August, 2022.

*[signature: Eldon E. Fallon]*

**UNITED STATES DISTRICT JUDGE**